CHAZ HIGGS, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 49883

January 14, 2010 222 P.3d 648

*Law Office of David R. Houston* and *David R. Houston*, Reno;
*Richard F. Cornell*, Reno, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *Richard A. Gammick*, District Attorney, and *Terrence P. McCarthy*, Deputy District Attorney, Washoe County, for Respondent.

*Peter Chase Neumann*, Reno, for Amicus Curiae Nevada Justice Association.

## OPINION

By the Court, HARDESTY, J.:

In this appeal, appellant Chaz Higgs challenges his conviction of first-degree murder for the death of his wife, Kathy Augustine. Higgs asserts that his conviction should be overturned for the following reasons: (1) the district court abused its discretion when it denied his motion to continue the trial, (2) sufficient evidence does not support his conviction, (3) the district court abused its

discretion when it admitted the testimony of the State's scientific expert, (4) the district court abused its discretion when it refused to give Higgs' proffered jury instruction regarding the spoliation of tissue samples, and (5) numerous alleged instances of plain error deprived him of a fair trial.

We note from the outset that we originally decided this appeal in an unpublished order filed on May 19, 2009. Amicus curiae Nevada Justice Association subsequently moved for publication of our disposition as an opinion. Cause appearing, we grant the motion and publish this opinion in place of our prior unpublished order. In so doing, we use this opportunity to reaffirm the standard for the admissibility of expert testimony in Nevada, as it is articulated by NRS 50.275. While Nevada's statute of admissibility tracks the language of its federal counterpart, Federal Rule of Evidence (FRE) 702, we see no reason to part with our existing legal standard. In so deciding, we decline Higgs' invitation to adopt the standard of admissibility set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Further, we reject the notion that our decision in *Hallmark v. Eldridge*, 124 Nev. 492, 189 P.3d 646 (2008), adopted the standard set forth in *Daubert* inferentially. We conclude, therefore, that Higgs' challenge to the testimony of the State's scientific expert fails, as do all the other arguments he raises on appeal. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

In 2003, Higgs, an experienced nurse, and Augustine, a Nevada politician, married. By all accounts, the marriage had deteriorated by 2006. On July 7, 2006, Kim Ramey, a critical care nurse who worked with Higgs, had a conversation with Higgs about his relationship with Augustine. Higgs stated that they were having marital problems and that he intended to seek a divorce. Later that day, Higgs and Ramey had another conversation about a widely publicized case in which a husband killed his wife, shot the judge presiding over the couple's divorce, and fled to Mexico. Higgs commented during their conversation, "That guy did it wrong. If you want to get rid of someone, you just hit them with a little succs because they can't trace it [postmortem]." "Succs" referenced succinylcholine, a paralytic drug that is commonly used in emergency rooms.

In the early morning hours of July 8, 2006, Higgs called emergency personnel to the couple's home after he found Augustine unresponsive. The paramedics were able to restore Augustine's heartbeat, but she could not breathe on her own. Augustine was transported to a local hospital.

Upon learning of Augustine's admittance, Ramey informed police about her previous conversation with Higgs. Ramey also informed a colleague who, in turn, informed Augustine's attending

physician, Dr. Richard Ganchan, and told him to test for a succinylcholine level on Augustine.

Neither the paramedics nor the hospital staff administered any succinylcholine while treating Augustine. Hospital staff, however, obtained a urine sample for treatment purposes. On July 11, 2006, Augustine died after she was removed from life support.

The urine sample, which was an ante mortem sample, meaning it was taken from Augustine while she was alive, and the tissue samples, which were postmortem, were tested by the hospital's toxicologist and subsequently the coroner's laboratory. The hospital lab results of the urine sample tested positive for barbiturates. The coroner's office laboratory results showed no signs of any substances; however, since the laboratory had been ordered to look for succinylcholine, it sent specimens to the FBI for further testing. The urine sample tested positive for both succinylcholine and succinylmonocholine,[2] but the postmortem tissue samples showed no signs of any substance.

In September 2006, Higgs was arrested in Virginia. In December 2006, Higgs was formally charged with first-degree murder in connection with the death of Augustine. The State's theory of the case was that sometime on either July 7 or 8, 2006, Higgs murdered Augustine by administering a lethal dose of succinylcholine.

*Pretrial proceedings*

In December 2006, the parties stipulated to a trial date of July 2007. The district court appointed Chip Walls as Higgs' expert witness. Walls is one of the foremost experts on the subject of succinylcholine. The State sent the FBI toxicology report to Walls in December 2006. A month later, in January 2007, both parties stipulated to advance the trial date to June 2007.

In May 2007, District Court Judge Jerome Polaha, upon the stipulation of the parties, entered an order instructing the State to provide Higgs more information regarding the description of methodology and procedures used in the FBI's succinylcholine testing. The same month, Higgs filed a motion to continue the trial. He argued that Walls needed more time to evaluate and verify the methodology utilized by the FBI laboratory because the FBI's test results were inconsistent. At the hearing on the motion to continue, defense counsel admitted that no one was to blame for the fact that Walls had not finished evaluating the FBI's test results. In fact, defense counsel stated that the parties had worked together to compile the list of materials set forth in Judge Polaha's discov-

---

[2] "[S]uccinylcholine is a very unstable compound that breaks down rapidly to produce succinylmonocholine, a less unstable compound that breaks down to form succinic acid and choline, which are naturally present in the human body." *Sybers v. State*, 841 So. 2d 532, 542 (Fla. Dist. Ct. App. 2003).

ery order. The district court denied the motion to continue the trial. In making the decision, the district court noted that the defense received the FBI toxicology report in early December 2006, some 24 weeks before the trial date, and only now was raising concerns. It further stated that Walls could indeed testify that, based on his scientific knowledge and expertise, he did not trust the validity of the FBI test results, if that were the case. Finally, the district court observed that the State had the burden of proof, not the defense, and therefore Higgs did not need to find an alternative theory to disprove the State's evidence.

On June 18, 2007, the first day of trial, the district court held a hearing on Higgs' motion in limine regarding scientific evidence and expert witness testimony. During that hearing, Higgs' expert witness, Walls, testified extensively regarding the FBI's toxicology report and the methodology used by its toxicologist, Madeline Montgomery. Walls stated that Montgomery exchanged information with him and answered all of his questions during a telephone call.

## The trial

At trial, Ramey testified regarding her conversation with Higgs about succinylcholine and how he described it as a drug that could not be detected postmortem. The State further presented the testimony of various hospital staff, who testified as to the availability of succinylcholine to hospital personnel. Registered nurse and Higgs' former manager, Tina Carbone, testified that succinylcholine was stored on crash carts,[3] in rapid sequence intubation kits in emergency rooms, and in secured refrigerators alongside other drugs, such as etomidate, a short acting intravenous anesthetic agent. Marlene Swanbeck, a registered nurse working at the same hospital as Higgs, testified that while a nurse needed to type in a security code to get registered drugs like succinylcholine, once accessed, the nurse could take any other drug instead of, or in addition to, what the nurse listed he or she was taking and there would be no way of tracking such misuse.

Building on Swanbeck's testimony, the State offered evidence that it had found a vial of etomidate in a backpack in the master bedroom of Augustine and Higgs' home, yet there was no record of etomidate missing from hospital records. City of Reno police officer David Jenkins testified that he found the same backpack when executing an arrest warrant for Higgs in Virginia. Jenkins further testified that the backpack included a nursing book, with a bookmark at the page concerning the administration of succinylcholine, and a laminated 3" × 5" card with information concerning succinylcholine.

---

[3]Generally, crash carts contain defibrillators and intravenous medications.

Dr. Steve Mashour, one of Augustine's attending physicians, testified that because succinylcholine was found in Augustine's ante mortem urine sample, the cause of death could be attributed to succinylcholine poisoning. Dr. Mashour explained that Augustine's routine tests showed no signs of a stroke or heart attack. The State presented two other witnesses, Dr. Stanley Thompson and Dr. Paul Katz, who similarly ruled out a heart attack or stroke as a cause of death. Both doctors opined that Augustine's death was consistent with succinylcholine poisoning.

Dr. Ellen Clark, a forensic pathologist who performed the autopsy on Augustine, testified that, in her opinion, Augustine died from succinylcholine toxicity. Dr. Clark also testified that if a nurse is good at delivering an injection, there will be no resulting bruise or large bloody track underneath the skin. She testified that the succinylcholine could have been injected into Augustine in such a manner that she would not be able to identify the injection site during an autopsy. Dr. Clark further testified that the autopsy did not reveal damage to Augustine's heart that would be reflective of a massive heart attack. As to the tissue sample, taken from what appeared to be a puncture wound, Dr. Clark explained that she could not be certain as to whether the area was an injection site or simply a needle mark. In sum, she could not confirm that the tissue sample was the site where the succinylcholine was administered.

With regard to the tissue sample, Dr. Paul Sohn, a pathologist who testified for Higgs, stated that his examination of the tissue sample and the photographs of the puncture wound led him to conclude that it was a fresh wound, barely 48 hours old. Dr. Sohn testified that it was not medically possible that this wound was 80 hours old (80 hours would have meant that the skin was punctured sometime on either July 7 or July 8, 2006, when the State theorized Higgs injected Augustine with succinylcholine). Dr. Sohn testified that he could not date the actual tissue sample because when he received it from the FBI it had been frozen, unfrozen, and frozen once again. Despite not being able to test the tissue sample himself, Dr. Sohn testified that he was certain that the wound site could not have been inflicted before Augustine arrived at the hospital.

Madeline Montgomery, the FBI toxicologist, testified as to the procedure and methodology of the bureau's succinylcholine testing. Montgomery testified that she had ongoing training in the field and had authored several publications and given numerous presentations on matters relevant to her field. Montgomery explained that the FBI laboratory in which she worked had dealt with succinylcholine in the past and had procedures in place for its testing. She testified that Augustine's urine sample was in a liquid state when

she received it and that she refroze it to prevent degradation. Montgomery explained that succinylcholine is a very volatile chemical; it breaks down into succinylmonocholine in the body; the substance does not occur naturally in a living human; and she found succinylcholine and its breakdown product, succinylmonocholine, in Augustine's urine sample. She stated that she ran three separate urine tests on Augustine's urine sample and each test showed the presence of succinylcholine and succinylmonocholine. Montgomery testified that the tissue samples did not test positive for succinylcholine or succinylmonocholine. She explained that this was not surprising because the chemical is so unstable and body enzymes act upon it to break it down. Accordingly, Montgomery testified that it is unusual to find succinylcholine in tissue samples.

There was also evidence presented about the nature of Higgs and Augustine's marriage. Several witnesses confirmed that Higgs routinely referred to Augustine in derogatory terms. Paramedics who transported Augustine to the hospital testified that Higgs appeared unemotional, even reading the newspaper while in the ambulance. Other witnesses testified that Higgs appeared unemotional after his wife died. One friend testified about a particularly nasty phone call between Higgs and Augustine's mother following Augustine's death, during which Higgs strongly disparaged Augustine.

Higgs' strong dislike for his wife was further bolstered by the testimony of Linda Ramirez, a hospital employee who worked with Higgs. She testified that the two of them had a flirtatious relationship. Ramirez read one of Higgs' e-mails that he had sent to her in which he explained, "[I]t is my quest in life to drive this bitch [Augustine] crazy. . . . I have things in motion. . . . I will be free, and I will be with you."

The jury found Higgs guilty of first-degree murder. This appeal followed.

## DISCUSSION

*Motion to continue the trial*

Higgs argues that the district court violated his rights under the Fifth, Sixth, and Fourteenth Amendments when it denied his motion to continue the trial. He asserts that his defense expert did not have adequate time to evaluate the conclusions of the FBI's toxicology report that confirmed the presence of succinylcholine in Augustine's urine. Specifically, he asserts that FBI toxicologist Montgomery defied the court order instructing her to provide discovery. Without the full FBI report, Higgs argues that his expert witness, Chip Walls, could not testify as to the validity of the

FBI report and the defense could not adequately cross-examine Montgomery.

"This court reviews the district court's decision regarding a motion for continuance for an abuse of discretion." *Rose v. State*, 123 Nev. 194, 206, 163 P.3d 408, 416 (2007). Each case turns on its own particular facts, and much weight is given to the reasons offered to the trial judge at the time the request for a continuance is made. *Zessman v. State*, 94 Nev. 28, 31, 573 P.2d 1174, 1177 (1978). This court has held that generally, a denial of a motion to continue is an abuse of discretion if it leaves the defense with inadequate time to prepare for trial. *See id.* In other instances, we have held that a denial of a motion to continue was an abuse of discretion if "a defendant's request for a modest continuance to procure witnesses . . . was not the defendant's fault." *Rose*, 123 Nev. at 206, 163 P.3d at 416. However, if a defendant fails to demonstrate that he was prejudiced by the denial of the continuance, then the district court's decision to deny the continuance is not an abuse of discretion. *Id.*

We conclude that the district court did not abuse its discretion when it denied Higgs' motion to continue the trial because Higgs has failed to demonstrate that he was prejudiced by the denial.

By defense counsel's own admission, there was no explanation for the delay in asking for more information regarding the FBI's toxicology report. Higgs' expert witness, Chip Walls, had approximately six months to question, evaluate, and determine whether additional information about the toxicology report would be necessary for his consideration. During the hearing on the motion to continue, the State explained that Walls had received the toxicology report on December 7, 2006, yet Higgs failed to ask for additional information about the report until May 2007. In regard to the delay, defense counsel stated, "The fault, unfortunately, really doesn't lie anywhere." Defense counsel, Walls, the State, and Montgomery *all worked together* to compile the list of materials, which constituted part of the discovery order signed by Judge Polaha. In addition, Montgomery spoke to Walls on the phone. Walls later testified that during that phone conversation, the two exchanged information and Montgomery answered his questions. Walls admitted that he could have asked Montgomery more specific questions and she would have answered them, but he chose not to ask additional questions. Walls confirmed that he and Montgomery exchanged information and all that was left was for him "to complete [his] thoughts with her." The additional information that Montgomery compiled for Walls had to be cleared by the

FBI's attorneys before it could be sent to Walls. Accordingly, we conclude that there is no evidence in the record supporting Higgs' contention that Montgomery violated the district court's discovery order. Rather, substantial evidence on the record shows that Montgomery was cooperative with the defense.

We further observe that on the morning of June 18, 2007, before the beginning of the trial, Walls testified extensively during a motion-in-limine hearing regarding expert witness testimony. He testified about succinylcholine in general and the difficulties of testing the substance, as well as the problems with testing urine samples for succinylcholine. Walls' testimony was thoughtful and thorough; he explained the aspects of the FBI testing he agreed with and the aspects he questioned. Perhaps most importantly, Walls testified that while he had some reservations regarding the FBI's methodology, he agreed with the findings of Montgomery's toxicology report.

Higgs does not offer any reason why Walls did not testify at trial as he did at the hearing on the motion in limine. However, Walls' testimony during the motion-in-limine hearing supplied to Higgs the discovery necessary to conduct an effective cross-examination of Montgomery. See Pantano v. State, 122 Nev. 782, 790, 138 P.3d 477, 482 (2006) (observing that " 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish' " (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986))). Moreover, by defense counsel's own statements at the continuance hearing, Walls had known for weeks that the FBI lab machine that Montgomery had used had malfunctioned at one point. The evidence on the record shows that the discovery available to Higgs at the time of trial met constitutional guarantees of an opportunity to effectively cross-examine Montgomery, and therefore, we conclude that Higgs was not prejudiced by the district court's denial of the motion to continue.

We also note that Higgs had a number of other opportunities before trial to seek a continuance because he needed more time to evaluate the toxicology report. The district court held several pretrial hearings on other motions during which Higgs could have again asked for more time. Specifically, the district court held a hearing on June 8, 2007, to confirm the trial date, during which Higgs' defense counsel expressly stated, "We'll be ready on June 18th."

We make a final observation with regard to the motion to continue. It was based on the defense's need for more time to investigate evidence relating to the cause of death. This court has held that cause of death can be shown by circumstantial evidence. West v. State, 119 Nev. 410, 416, 75 P.3d 808, 812 (2003). A denial of

a motion to continue to allow the defense to investigate a report as to the cause of death is not prejudicial when the State could prove cause of death with other circumstantial evidence. Even if Higgs had more time to investigate the FBI toxicology report, it would not change the fact that the State had enough circumstantial evidence to prove Augustine's cause of death.

We therefore conclude that the district court did not abuse its discretion when it denied Higgs' motion to continue the trial because Higgs fails to demonstrate that any prejudice resulted from the denial.

*Sufficiency of the evidence*

Higgs argues that the evidence presented at trial does not support a conviction of first-degree murder. We disagree.

In reviewing the sufficiency of the evidence, we must decide " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Rose v. State*, 123 Nev. 194, 202, 163 P.3d 408, 414 (2007) (quoting *Origel-Candido v. State*, 114 Nev. 378, 381, 956 P.2d 1378, 1380 (1998)). We conclude that there was sufficient evidence to support Higgs' conviction.

The State presented testimony establishing that Augustine's death was not the result of natural causes but, rather, was the result of succinylcholine poisoning. Attending physician Dr. Mashour testified that routine tests at the hospital showed no signs of a stroke or heart attack. He testified that because succinylcholine was found in Augustine's ante mortem urine sample, succinylcholine poisoning was the likely cause of death. Two other physicians, Dr. Thompson and Dr. Katz, similarly testified that Augustine's death was a result of succinylcholine poisoning. In addition, Dr. Clark, the forensic pathologist who performed the autopsy on Augustine, also testified that in her opinion the cause of death was succinylcholine toxicity. She further testified that the drug could have been injected in such a manner as to go undetected. Dr. Clark testified that the autopsy revealed that Augustine's heart showed no signs of disease that would cause a massive heart attack. FBI toxicologist Montgomery explained that she found succinylcholine and its breakdown product, succinylmonocholine, in Augustine's urine sample. Montgomery testified that all three tests she ran on the urine sample tested positive for the presence of succinylcholine and succinylmonocholine. She further stated that it is not unusual that the drug was not present in Augustine's tissue sample because

it is such a volatile chemical that the body acts quickly to break it down. The State also presented evidence that Augustine was not administered any succinylcholine at the hospital.

The State also presented evidence establishing that Higgs killed Augustine. Ramey testified that the day before Augustine was found unconscious, she had a conversation with Higgs during which he commented on a local murder trial saying, ''That guy did it wrong. If you want to get rid of somebody, you just hit them with a little succs.'' Ramey testified that Higgs then made a gesture mimicking giving a person an injection. She further testified that Higgs explained to her that succinylcholine could not be detected postmortem. In addition to Ramey's testimony, the State presented circumstantial evidence of Higgs' access to succinylcholine. The substance is just one of the resources available to hospital staff like Higgs, who is an experienced nurse. Testimony established that succinylcholine is generally stored on crash carts, in emergency rooms, and in secured refrigerators, and while one needs a security code to access the refrigerated drugs, once accessed, additional drugs can be taken from the secured refrigerator without notice.

To build its theory that, as an experienced nurse, Higgs could easily obtain succinylcholine as well as other drugs, the State offered the testimony of Officer Jenkins. Officer Jenkins testified that when he executed the search warrant at the Higgs/Augustine home, he found the drug etomidate in a backpack in the master bedroom. Officer Jenkins stated that he collected the vial of etomidate, but did not take the backpack. Officer Jenkins testified that later, when executing the arrest warrant in Hampton, Virginia, the same backpack was in Higgs' possession and he collected it. He explained that this time the backpack contained a nursing book with a bookmark at the page concerning the administration of succinylcholine and a laminated $3" \times 5"$ card with information concerning succinylcholine. Additionally, the State presented evidence that there was no hospital record of a missing vial of etomidate—even though a vial had indeed been found in the backpack in Higgs' home—establishing that drugs can be taken out of secured locations without notice.

The State also presented evidence of the deteriorated relationship between Higgs and Augustine. Witnesses testified that Higgs regularly used derogatory terms when referring to Augustine, he strongly disparaged his wife to Augustine's mother just days after Augustine's death, and he appeared unemotional throughout the ordeal. Additionally, Ramirez testified as to the flirtatious relationship that she had with Higgs and read from one of his e-mails in which Higgs stated that he wanted to drive Augustine crazy, he had plans in motion, and he would soon be free to be with Ramirez.

We conclude that, in addition to the medical evidence and the FBI toxicology report, there was other significant evidence pre-

sented to the jury—namely, Higgs' deteriorating relationship with his wife, his access to the succinylcholine, and his own comments to Ramey—that was sufficient for any rational trier of fact to find the essential elements of first-degree murder beyond a reasonable doubt.

*Expert testimony*

Higgs next contends that the district court abused its discretion when it allowed Montgomery to testify about the presence of succinylcholine in Augustine's urine. In so doing, he does not contend that the district court was incorrect in admitting the testimony under Nevada law. Rather, Higgs invites this court to adopt the standard of admissibility for expert testimony established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), under which he asserts that Montgomery's testimony was inadmissible. Because the admissibility of expert witness testimony post-*Daubert* has resulted in considerable confusion and controversy, we determine it is necessary to revisit the opinion, its history, and its trajectory.

Before *Daubert*, the seminal case for expert witness testimony was *Frye*. In *Frye*, the Court of Appeals of the District of Columbia (now known as the United States Court of Appeals for the District of Columbia Circuit) held that an expert opinion based on a scientific technique is inadmissible unless the technique has "gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

In *Daubert*, the United States Supreme Court concluded that *Frye*'s "austere standard" was "incompatible" with the Federal Rules of Evidence. 509 U.S. at 589. In concluding that the general acceptance test of *Frye* had been "displaced" by the Federal Rules of Evidence, *id.*, the Supreme Court interpreted the Federal Rules as a means of liberalizing the admission of expert witness testimony, stating that:

> . . . a rigid general acceptance requirement would be at odds with the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony.

*Id.* at 588 (internal quotation marks omitted).

After rejecting *Frye* and recognizing the more relaxed standard of the Federal Rules, the High Court explained that any analysis pursuant to FRE 702 must focus on two overarching issues: the expert testimony's relevance and reliability. *Id.* at 589. The majority then stated that it was appropriate for it to make "some general ob-

servations'' about the inquiry into relevance and reliability of expert witness testimony. *Id.* at 593. Before discussing factors that it determined may bear on the issues of relevance and reliability, the majority emphasized that the factors discussed were neither exhaustive nor applicable in every case.[4] *Id.* Indeed, the Supreme Court expressly stated that ''[m]any factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test,'' *id.*, and called the inquiry into admissibility a ''flexible one.'' *Id.* at 594. It characterized the trial judge's role to determine whether the proferred testimony met the criterion of admissibility as that of a gatekeeper. *Id.* at 597. Thus, while the Supreme Court interpreted FRE 702 as the gate leading toward admissibility, it placed numerous factors, albeit ''flexible'' ones, upon the opening of the gate and cast the trial judge in the role of gatekeeper.

In his dissent, Chief Justice Rehnquist was critical of the majority's decision to provide lower court's with such elaborate factors:

> Questions arise simply from reading this part of the Court's opinion, and countless more questions will surely arise when hundreds of district judges try to apply its teaching to particular offers of expert testimony. Does all of this *dicta* apply to an expert seeking to testify on the basis of technical or other specialized knowledge—the other types of expert knowledge to which Rule 702 applies—or are the general observations limited only to scientific knowledge?

*Id.* at 600 (Rehnquist, C.J., dissenting) (internal quotation marks omitted). Chief Justice Rehnquist was concerned that the factors would be applied strictly notwithstanding the majority's statements against such application, would cause confusion, and would force judges to become ''amateur scientists.'' *Id.* at 601.

After *Daubert*, the Supreme Court had the opportunity to consider the issue of expert witness testimony again in *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and later in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). First, in *General Electric Co. v. Joiner*, the Supreme Court held that the proper appellate review of a trial court's decision to admit or exclude expert witness testimony was for an abuse of discretion. 522 U.S. at 143. In so holding, the Supreme Court noted that the appellate court ''failed to give the trial court the deference that is the hallmark of

---

[4]In sum, the *Daubert* opinion determined that, functioning as a gatekeeper with respect to the admission of expert testimony, the judge may wish to consider whether the evidence at issue (1) has been tested, (2) ''has been subjected to peer review and publication,'' (3) has a known or potential error rate, and (4) has general or widespread acceptance. *Daubert*, 509 U.S. at 593-94.

abuse-of-discretion review." *Id.* In sum, *Joiner* highlighted the trial judge's discretion in determining expert witness testimony post-*Daubert*.

Following *Joiner*, the U.S. Supreme Court extended its holding in *Daubert* to include all expert testimony, rather than just scientific. *Kumho Tire Co. v. Carmichael*, 526 U.S. at 141. While it expanded *Daubert* to include more expert testimony, the Court was careful to note that in so doing, it was vesting *more* discretion in the trial judge and *not* mandating strict adherence to *Daubert*'s admissibility factors:

> The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.
>
> *Daubert* itself is not to the contrary. It made clear that its list of factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged. It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist. Nor, on the other hand, does the presence of *Daubert*'s general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy.

*Id.* at 150-51.

Thus, in *Kumho*, the U.S. Supreme Court made clear its mandate in *Daubert*: allow district court judge's discretion to carry out their gatekeeping duties and treat the *Daubert* factors as flexible. Notwithstanding the mandate for a flexible standard, lower courts have applied *Daubert* in a rigid manner. *See, e.g., U.S. v. McCaleb*, 552 F.3d 1053, 1060-61 (9th Cir. 2009) (explaining that the *Daubert* factors are flexible, but using only the *Daubert* factors in evaluating whether the district court abused its discretion when allowing testimony of a forensic chemist); *see also U.S. v. Baines*, 573 F.3d 979, 985-87 (10th Cir. 2009) (explaining that the *Daubert* factors are flexible, but then engaging in a strict application of the *Daubert* factors in its review of trial court's decision on expert witness testimony); *Carrier v. City of Amite*, 6 So. 3d 893, 898 (1st Cir. 2009) (holding that lower court committed legal error because it did not conduct an evaluation of the *Daubert* fac-

tors); *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008) (explaining that the *Daubert* factors are flexible, but then using the *Daubert* factors to define threshold question of reliability); *Ruffin v. Shaw Industries, Inc.*, 149 F.3d 294, 297-300 (4th Cir. 1998) (determining that proffered expert opinion testimony was not admissible because it did not meet all the *Daubert* factors). States that have adopted the *Daubert* standard for admissibility appear to engage in similar application, remarking on the standard's flexibility, yet applying it restrictively. *See, e.g.*, *Independent Fire Ins. Co. v. Sunbeam Corp.*, 755 So. 2d 226, 234 (La. 2000) (in adopting the *Daubert* standard, court noted that it was also adopting the factors set forth in *Daubert*).

It is this type of application of the *Daubert* factors that Chief Justice Rehnquist cautioned against and that leads us to decline to adopt the so-called *Daubert* standard. Our rejection of *Daubert* is based on the resulting application of the doctrine and underscores Chief Justice Rehnquist's concerns regarding the dicta in the majority's decision. It is not what the majority stated in *Daubert* that we take issue with, but rather the subsequent rigid application of the enumerated factors.

Indeed, to the extent that *Daubert* espouses a flexible approach to the admissibility of expert witness testimony, this court has held it is persuasive. *Hallmark v. Eldridge*, 124 Nev. 492, 498, 189 P.3d 646, 650 (2008). But, to the extent that courts have construed *Daubert* as a standard that requires mechanical application of its factors, we decline to adopt it. We see no reason to limit the factors that trial judges in Nevada may consider when determining expert witness testimony admissibility. As evidenced by the amicus brief filed by the Nevada Justice Association, *Hallmark* appears to have been interpreted as an inferential adoption of *Daubert*. While in our view *Hallmark* demonstrates an adherence to Nevada's standard for admissibility of expert testimony, we concede that the language in that decision may be misleading. Specifically, the decision states that this court has construed NRS 50.275 to track FRE 702, and then explains that *Daubert* is persuasive authority. *Hallmark*, 124 Nev. at 498, 189 P.3d at 650. It is reasonable to construe this portion as an endorsement, if not adoption, of *Daubert*. For that, we are critical of the decision. *Hallmark* was not intended to cause confusion and cast doubt on the standard of expert witness testimony in Nevada. To the contrary, the opinion was meant to clarify the rule that in Nevada NRS 50.275 is the blueprint for the admissibility of expert witness testimony.

In *Hallmark*, we stated that *Daubert* and federal court decisions discussing it "may provide persuasive authority." *Hallmark*, 124 Nev. at 498, 189 P.3d at 650. We did not, however, and do not today, adopt the *Daubert* standard as a limitation on the factors that

a trial judge in Nevada may consider. We expressly reject the notion that our decision in *Hallmark* inferentially adopted *Daubert* or signaled an intent by this court to do so.

A close reading of *Hallmark* is helpful. This court concluded that the district court abused its discretion in allowing the expert testimony of a biochemical engineer. 124 Nev. at 502, 189 P.3d at 652. In so doing, we summarized Nevada's jurisprudence regarding expert witness testimony pursuant to NRS 50.275. 124 Nev. at 498-502, 189 P.3d at 650-52. We identified the three overarching requirements for admissibility of expert witness testimony pursuant to NRS 50.275 as (1) qualification, (2) assistance, and (3) limited scope requirements. 124 Nev. at 498, 189 P.3d at 650. This court then identified factors to be considered under each requirement. 124 Nev. at 499-502, 189 P.3d at 650-52. We were careful to note that the list of factors was not exhaustive, and we recognized that every factor may not be applicable in every case and would likely be accorded varying weight from case to case. *Id.* at 499-502, 189 P.3d at 651-52. It is worth noting that we supported our conclusion by citing to Nevada cases, not federal.

We see nothing unclear about our decision to adhere to state law, while looking at federal jurisprudence for guidance—when *needed*. Sister states, including Indiana, Tennessee, New Hampshire, and California have employed the same reasoning: rejecting an adoption of *Daubert*, applying state law admissibility standards, and looking at federal authority for guidance. *See Ingram v. State*, 699 N.E.2d 261, 262 (Ind. 1998) (explaining that in determining reliability, while many factors have been identified, there is no particular standard); *see also McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997) ("Although we do not expressly adopt *Daubert*, the non-exclusive list of factors . . . are useful . . . ."); *State v. Hungerford*, 697 A.2d 916, 922 (N.H. 1997) (declining to adopt *Daubert*, but noting that state evidence code, caselaw from other jurisdictions, as well as *Daubert*, were helpful considerations in determining the admissibility of expert witness testimony); *People v. Leahy*, 882 P.2d 321, 327 (Cal. 1994) (declining to adopt *Daubert*, yet explaining that inquiry into general acceptance entails analysis of the relevancy of the proffered testimony (relevancy being a staple of the *Daubert* inquiry)). What *Hallmark* and similar cases from sister jurisdictions demonstrate is that whether dealing with scientific or nonscientific expert testimony, there is the inevitable overlap of factors gatekeepers will consider, mainly relevancy and reliability. By not adopting the *Daubert* standard as a limitation on judges' considerations with respect to the admission of expert testimony, we give Nevada trial judges wide discretion, within the parameters of NRS 50.275, to fulfill their gatekeeping duties. We determine that the framework

provided by NRS 50.275 sets a degree of regulation upon admitting expert witness testimony, without usurping the trial judge's gatekeeping function.

Consider the differences between NRS 50.275 and FRE 702. NRS 50.275 states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowledge, skill, experience, training or education may testify to matters within the scope of such knowledge.

FRE 702 contains similar language, but with additional conditions, which were added in response to the *Daubert* trilogy (*Daubert, Joiner,* and *Kumho*):

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Whereas the federal rule mandates three additional conditions that trial judges should consider in evaluating expert witness testimony, the Nevada statute mandates no such requirements. Rather, NRS 50.275 provides general guidance and allows the trial judge discretion in deciding what factors are to be considered on a case-by-case basis. In *Hallmark*, we outlined some factors that are useful in this inquiry, but repeatedly noted that the factors enumerated "may not be equally applicable in every case." 124 Nev. at 499, 502, 189 P.3d at 651, 652. We determine that the benefit of our approach is twofold: first, it gives judges wide discretion to perform their gatekeeping duties; and, second, it creates an inquiry that is based more in legal, rather than scientific, principles.

In Nevada, the qualification, assistance, and limited scope requirements are based on legal principles. The requirements ensure reliability and relevance, while not imposing upon a judge a mandate to determine scientific falsifiability and error rate for each case.[5] In sum, *Daubert*, as any other case decided by the U.S.

---

[5]A widely cited study involving 400 state court trial judges gives credence to these concerns. In response to questions regarding the *Daubert* factors, the judges' responses showed a lack of understanding:

> . . . only 4% could provide an explanation that demonstrated a clear understanding of the testing and falsifiability factor; while a startling 35% of the judges gave answers which were unequivocally wrong. Similarly,

Supreme Court, is looked upon favorably by this court. We do not, however, adopt the *Daubert* standard as a limitation on the factors considered for admissibility of expert witness testimony. We hold that NRS 50.275 provides the standard for admissibility of expert witness testimony in Nevada.

With those principles in mind, we now turn to whether the district court abused its discretion in allowing Montgomery to testify as an expert witness. We first consider whether Montgomery was qualified to testify as an expert witness. Among the factors the court may have considered in determining Montgomery's qualifications were whether she had formal schooling, proper licensure, employment experience, and practical experience and specialized training. *See Hallmark*, 124 Nev. at 499, 189 P.3d at 650-51.

Montgomery had a science degree, was employed with the FBI's toxicology department, and had acquired specialized knowledge and training with regard to succinylcholine testing. Accordingly, we conclude that the district court acted within its discretion when it found that Montgomery met the qualification requirement.

Next, we consider whether Montgomery's testimony assisted the jury to understand the evidence or to determine a fact in issue. We have explained that expert witness testimony "will assist the trier of fact only when it is relevant and the product of reliable methodology." *Id.* at 500, 189 P.3d at 651 (citations omitted). While each case turns upon varying factors, as discussed above, in *Hallmark*, we articulated five factors to judge reliability of a methodology, instructing the district court to consider whether the proffered opinion is

> (1) within a recognized field of expertise; (2) testable and has been tested; (3) published and subjected to peer review; (4) generally accepted in the scientific community (not always determinative); and (5) based more on particularized facts rather than assumption, conjecture, or generalization.

*Id.* at 500-01, 189 P.3d at 651-52 (citations omitted).

We conclude that the district court did not abuse its discretion when it found that Montgomery's testimony would assist the jury.

---

only 4% demonstrated a clear understanding of "error rate," 86% gave answers best classified as equivocal, and 10% gave clearly wrong answers. Concerning peer review, the majority of the judges clearly understood the concept, while 10% clearly did not.

Michel F. Baumeister and Dorothea M. Capone, *Admissibility Standards As Politics—The Imperial Gate Closers Arrive!!!*, 33 Seton Hall L. Rev. 1025, 1040-41 (2003) (citing Sophia Gatowski et al., *Asking the Gatekeepers: Results of a National Survey of Judges on Judging Expert Evidence in a Post*-Daubert *World*, 25 Law & Hum. Behav. 433 (2001)).

Montgomery is part of a small group of toxicologists in the country with experience in testing for succinylcholine. In addition, she had ongoing training in the field, and had authored dozens of publications and given numerous presentations on matters relevant to her field. Montgomery's work was testable although it is unclear whether it had been tested. The record does not contain evidence as to whether Montgomery's work had been subject to peer review. And, while it is unclear the scope of acceptance that Montgomery's methodology has in the scientific community, Walls testified in the pretrial hearings that he did not take issue with her methodology or results. While the testing methodology used by Montgomery did not meet all the *Hallmark* factors for assessing reliability, those factors may be afforded varying weights and may not apply equally in every case. It is up to the district court judge to make the determination regarding the varying factors as he or she is the gatekeeper—not this court. In this case, we determine that the district court acted within its discretion when it found that Montgomery's testimony would assist the jury in understanding the evidence and determining a fact in issue.

Lastly, we consider whether the district court correctly determined that Montgomery's testimony met the limited scope requirement. We conclude that it did because Montgomery's testimony consisted almost entirely of the highly particularized facts of testing Augustine's tissue and urine samples for succinylcholine. She explained the testing procedures for succinylcholine and the drug's volatile nature. Accordingly, Montgomery's testimony was limited to matters within the scope of her knowledge. In sum, as Montgomery had scientific and specialized knowledge, her testimony assisted the jury in understanding succinylcholine, and it was limited to her knowledge and expertise, we conclude that the district court did not abuse its discretion when it allowed Montgomery to testify.

*Jury instructions regarding spoliation of evidence*

Higgs contends that the district court abused its discretion when it refused to give Higgs' proffered spoliation instruction regarding the State's alleged failure to properly preserve evidence of an injection site tissue sample from Augustine's body. Higgs urges this court to apply the spoliation rule set forth in *Bass-Davis v. Davis*, 122 Nev. 442, 452-53, 134 P.3d 103, 109-10 (2006), to criminal cases. In *Bass-Davis*, a civil case, this court determined that even when missing evidence is not willfully destroyed, but rather is negligently destroyed, the party prejudiced by the loss of evidence is entitled to an "adverse inference instruction." *Id.*

We reject Higgs' suggestion that we extend the spoliation rule set forth in *Bass-Davis* to criminal cases. This court has articulated the rule for failure to preserve evidence in criminal cases, and we see no reason to depart from that standard.

 

"Due process requires the State to preserve material evidence." *Steese v. State*, 114 Nev. 479, 491, 960 P.2d 321, 329 (1998). The State's failure to preserve material evidence can lead to dismissal of the charges "if the defendant can show 'bad faith or connivance on the part of the government' or 'that he was prejudiced by the loss of the evidence.'" *Daniels v. State*, 114 Nev. 261, 267, 956 P.2d 111, 115 (1998) (quoting *Howard v. State*, 95 Nev. 580, 582, 600 P.2d 214, 215-16 (1979)). Moreover, district courts have "broad discretion to settle jury instructions." *Cortinas v. State*, 124 Nev. 1013, 1019, 195 P.3d 315, 319 (2008). Our review is, therefore, limited to inquiring whether there was an abuse of discretion or judicial error. *Id.*

In the present case, Higgs proffered three different adverse-inference jury instructions regarding spoliation of evidence. He asserted that the jury instructions were necessary because the State inadequately inspected and preserved the tissue sample from an injection site on Augustine's body. We disagree.

The district court properly rejected Higgs' proffered jury instructions because there was no evidence that the State acted in bad faith, and Higgs failed to show he was prejudiced by the State's failure to preserve the tissue sample. First, Higgs does not argue that the State acted in bad faith, but that it was negligent in its preservation of the tissue sample. With no issue raised as to bad faith, nor any evidence supporting such a determination, we need only consider if Higgs was prejudiced by the spoliation.

We determine that Higgs was not prejudiced by the spoliation of the tissue sample because the State did not benefit from its failure to preserve the evidence. *See Sanborn v. State*, 107 Nev. 399, 408, 812 P.2d 1279, 1286 (1991) (in holding that defendant was prejudiced by State's failure to preserve the evidence, the court explained that the State's case was "buttressed by the absence of [the] evidence"). The State's forensic toxicologist, Dr. Clark, admitted that she could not confirm that the tissue sample was from the site at which the succinylcholine was administered. More importantly, the defense's forensic toxicologist, Dr. Sohn, testified that while he could not retest the tissue sample to date it, he did examine it microscopically. He stated that his microscopic examination, along with the autopsy pictures of the site led him to conclude—with medical certainty—that the wound could not have been inflicted before Augustine was admitted to the hospital. The

failure to preserve the tissue sample prevented Dr. Sohn from dating the tissue sample, not from forming a medical conclusion in support of Higgs' defense that he did not inject his wife with succinylcholine. Accordingly, Higgs was not prejudiced by the State's failure to preserve the tissue sample from the injection site.

*Accumulation of plain error*

Higgs argues that a "prodigious" amount of plain error occurred during trial. Higgs asserts 11 instances of alleged plain error, although he does not fully brief the instances in detail and admits that counsel did not object to any of the 11 alleged instances of plain error. The 11 claims of error are as follows: (1) during Ramey's testimony, she described Higgs as a "player" and testified that she thought he was a "liar"; (2) Ramey testified that when she learned that Augustine had died, she thought Higgs had killed Augustine; (3) during Higgs' testimony, the trial was delayed due to his second suicide attempt; on cross-examination, the State asked Higgs whether some people might think that his during-trial suicide attempt was a ploy for sympathy and demonstrated consciousness of guilt; (4) during the same cross-examination, the State asked Higgs what motive Ramey would have to make up her testimony; (5) during the same cross-examination, the State asked Higgs if he disagreed with Dr. Clark's testimony, and Higgs said he did; (6) State witness Michelle Ene, Augustine's executive assistant, testified that Higgs told her that he and Augustine had worked out their differences the night before Augustine was found dead; Ene testified that she "didn't believe that for one minute" and was suspicious that Higgs may have had something to do with Augustine's death and that he "might have murdered her"; (7) Nancy Vinnek, one of Augustine's best friends, testified in the rebuttal case that Augustine frequently described Higgs as a "Doctor Jeckyll and a Mr. Hyde";[6] (8) during closing arguments, the State noted that Ramey was a good witness; (9) during closing arguments, the State noted that Higgs could not explain why Ramey would testify as she did, and that Dr. Richard Sehar, a State witness, who ordered the test to check for succinylcholine levels in Augustine's body, had testified that he believed Ramey's testimony; (10) the State argued that Higgs admitted that his toxicologist, Walls, did not disagree with the FBI's conclusion that succinylcholine was in Augustine's urine; and (11) during closing argument, the State said, "I know the defendant doesn't

---

[6]We note that Higgs misstates Ramey's testimony. Ramey testified, "And I [Ramey] would frequently describe [Higgs] to [Augustine] as a Dr. Jekyll and a Mr. Hyde." Therefore, it was Ramey who described Higgs as a Dr. Jekyll and Mr. Hyde, not Augustine.

have the burden . . . but he doesn't have a leash on him that prevents him from doing any of these things either."

"When an error has not been preserved," as is the case here because Higgs failed to object to any of the instances of alleged error, "this court employs plain-error review." *Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008). Pursuant to our plain-error review standard, "an error that is plain from a review of the record does not require reversal unless the defendant demonstrates that the error affected his or her substantial rights, by causing 'actual prejudice or a miscarriage of justice.' " *Id.* (quoting *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003)).

We have reviewed each of Higgs' claims of error and conclude that Higgs has failed to demonstrate how any of the alleged errors affected his substantial rights by causing actual prejudice or a miscarriage of justice. We conclude Higgs' plain-error argument is without merit.

Accordingly, we affirm the judgment of conviction.

PARRAGUIRRE, C.J., and DOUGLAS and GIBBONS, JJ., concur.

CHERRY, J., concurring in part and dissenting in part:

I concur with the majority's rejection of the invitation to adopt the standard of admissibility set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but I would reverse the judgment of conviction, because I conclude that the denial of Higgs' motion to continue the trial resulted in violation of his due process rights.

Higgs' motion to continue the trial was based upon the fact that his expert, Chip Walls, did not have adequate time to evaluate the conclusion of the FBI toxicology report. The conclusion of the report, that succinylcholine was found in Augustine's urine, formed the basis of the State's theory of the case.

If ever a continuance of the trial date should have been granted, the instant case cries out for that type of relief. Can it be said that there was any earth-shattering reason to proceed to a trial on a murder charge when discovery was incomplete and the FBI toxicology report lacked being a finished product?

At the time of the initial arraignment, December 22, 2006, appellant waived the statutory time to be brought to trial. Accordingly, the judge set the trial for July 16, 2007. Subsequently, the trial was moved up to June 18, 2007, per stipulation and order.

When a problem with discovery developed, appellant filed a motion to continue the trial date, which the State opposed.

A hearing on the motion to continue trial was held on May 25, 2007. Even though the defense presented information that defense

expert Walls had insufficient information to evaluate Ms. Montgomery's data and results properly, and insufficient information to give expert testimony at the trial on behalf of appellant, the court denied the continuance, ruling that the defense expert was free to testify that he did not trust the validity of the materials received from the FBI.

An excellent statement of the due process analysis is contained in *Ungar v. Sarafite*:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

376 U.S. 575, 589 (1964) (citations omitted).

In this case, there simply is nothing concrete in the record indicating why this case, having been set for trial six months after the arraignment, could not have been set out further.

This court reviews a district court's decision with regard to a motion to continue for an abuse of discretion. *Rose v. State*, 123 Nev. 194, 206, 163 P.3d 408, 416 (2007). While each case turns on its own circumstances, this court has long recognized the cornerstone principle of due process, that "[a]ccuseds have the right to be informed of the nature and cause of the accusation against them and must be afforded a reasonable opportunity to obtain witnesses in their favor." *Zessman v. State*, 94 Nev. 28, 31, 573 P.2d 1174, 1177 (1978) (citing *Cole v. Arkansas*, 333 U.S. 196 (1948)).

In determining whether denial of the defendant's request for continuance violates due process, "the focus must be on the need for the continuance and the prejudice resulting from its denial." *Manlove v. Tansy*, 981 F.2d 473, 476 (10th Cir. 1992) (affirming grant of habeas relief—denial of continuance denied potentially crucial evidence to defendant). So, for example, there would be no denial of due process if discrediting Ms. Montgomery hypothetically would have made no difference to the outcome of this case. *See Padgett v. O'Sullivan*, 65 F.3d 72, 75 (7th Cir. 1995). Similarly, if Mr. Walls hypothetically were merely a cumulative witness, Higgs would not be able to establish a due process violation. *See Foots v. State of LA.*, 793 F.2d 610, 611 (5th Cir. 1986).

However, if the failure to grant a continuance impinges on the defendant's rights to compulsory process and the defendant loses critical impeaching or supporting witnesses as a result, his due process rights are violated. *See State v. Timblin*, 834 P.2d 927, 929 (Mont. 1992) (citing *Singleton v. Lefkowitz*, 583 F.2d 618, 625 (2d Cir. 1978) (conviction reversed)); *March v. State*, 734 P.2d 231, 234 (N.M. 1987) (conviction reversed).

The majority concludes that Higgs failed to demonstrate that he was prejudiced by the denial. I disagree. I conclude that Higgs was prejudiced because his expert, Walls, one of the country's few experts on succinylcholine, did not testify at trial. While it is true that the defense had the toxicology report in its possession for 24 weeks, Walls did not believe the State had sent a complete report. Walls stated that the packet was incomplete and did not include backup data or documentation. The full report was the crux of the State's case against Higgs. Therefore, pursuant to *Zessman*, Higgs had the right to be informed of the nature of the accusation against him, including the complete FBI toxicology report. The lack of information not only affected Higgs' ability to obtain witnesses in his favor, it affected his ability to cross-examine the State's expert witness, Madeline Montgomery.

Why should a defense attorney be forced into a position of cross-examining an expert witness when the expert report is incomplete? If the district court's decision to deny the appellant's motion to continue the trial date is upheld by this court, it would allow incomplete discovery to be used to the detriment of a criminal defendant and appear to be a blatant denial of due process of law. Just because defense counsel cross-examined the State's expert witness during the motion in limine does not indicate that defense counsel had sufficient information in the long run to place his defense expert on the stand at trial in light of an incomplete toxicology report. *See Zessman*, 94 Nev. at 32, 573 P.2d at 1177 (citing *O'Brien v. State*, 88 Nev. 488, 500 P.2d 693 (1972)).

This court has observed that a defendant's right to discovery is tangentially related to the right of confrontation. *See Stamps v. State*, 107 Nev. 372, 376, 812 P.2d 351, 354 (1991). Here, I conclude that in order for Higgs' counsel to have prepared an effective cross-examination of Montgomery regarding the succinylcholine found in Augustine's urine, Higgs should have been afforded more time. The continuance would have allowed Walls time to evaluate Montgomery's technique and conclusions, and to draw his own inferences. While Walls had the packet from the FBI toxicology lab for months before the trial, I note that it was not until the district court issued an order directing the State to provide Higgs with the FBI toxicology report that the State sent the report to the defense. Moreover, Walls stated that the packet the FBI sent was incomplete

and that significant data was missing. Walls felt the FBI packet was missing important information about the verification process, such as backup data. This was vital information for Walls because during the testing of Augustine's urine for succinylcholine, one of the FBI's testing machines had malfunctioned. Given the volatile nature of succinylcholine and the fact that there were questions regarding the preservation of the urine and tissue sample, I conclude that due process required that Higgs be given more time to prepare what was arguably the most important piece of evidence. I am not persuaded by the majority's argument that Higgs could have effectively presented his arguments regarding the FBI toxicology report by merely cross-examining Montgomery. An effective cross-examination itself requires time and preparation. Likewise, because of the incomplete information provided to Walls by the State, Walls did not, and would not, testify for the defense at trial. The lack of expert testimony on behalf of Higgs was nothing less than devastating to the defense effort.

For the reasons set forth above, I dissent and would reverse the judgment based on the fact that the district court abused its discretion when it denied Higgs' motion to continue.

SAITTA, J., concurring in part and dissenting in part:

I concur in the majority's rejection of the invitation to adopt the standard of admissibility set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but I would reverse the judgment of conviction, because I conclude that the denial of Higgs' motion to continue the trial resulted in a violation of his due process rights.

Higgs' motion to continue the trial was based upon the fact that his expert, Chip Walls, did not have adequate time to evaluate the conclusion of the FBI toxicology report. The conclusion of the report, that succinylcholine was found in Augustine's urine, formed the basis of the State's theory of the case.

This court reviews a district court's decision with regard to a motion to continue for an abuse of discretion. *Rose v. State*, 123 Nev. 194, 206, 163 P.3d 408, 416 (2007). While each case turns on its own circumstances, this court has long recognized the cornerstone principle of due process, that "[a]ccuseds have the right to be informed of the nature and cause of the accusation against them and must be afforded a reasonable opportunity to obtain witnesses in their favor." *Zessman v. State*, 94 Nev. 28, 31, 573 P.2d 1174, 1177 (1978) (citing *Cole v. Arkansas*, 333 U.S. 196 (1948)).

The majority concludes that Higgs failed to demonstrate that he was prejudiced by the denial. I disagree. I conclude that Higgs was prejudiced because his expert, Walls, one of the country's few experts on succinylcholine, did not testify at trial. While it is true that the defense had the toxicology report in its possession for 24

weeks, Walls did not believe the State had sent a complete report. Walls stated that the packet was incomplete and did not include backup data or documentation. The full report was the crux of the State's case against Higgs. Therefore, pursuant to *Zessman*, Higgs had the right to be informed of the nature of the accusation against him, including the complete FBI toxicology report. The lack of information not only affected Higgs' ability to obtain witnesses in his favor, it affected his ability to cross-examine the State's expert witness, Madeline Montgomery.

This court has observed that a defendant's right to discovery is tangentially related to the right of confrontation. *See Stamps v. State*, 107 Nev. 372, 376, 812 P.2d 351, 354 (1991). Here, I conclude that in order for Higgs' counsel to have prepared an effective cross-examination of Montgomery regarding the succinylcholine found in Augustine's urine, Higgs should have been afforded more time. The continuance would have allowed Walls time to evaluate Montgomery's technique and conclusions, and to draw his own inferences. While Walls had the packet from the FBI toxicology lab for months before the trial, I note that it was not until the district court issued an order directing the State to provide Higgs with the FBI toxicology report that the State sent the report to the defense. Moreover, Walls stated that the packet the FBI sent was incomplete and that significant data was missing. Walls felt the FBI packet was missing important information about the verification process, such as backup data. This was vital information for Walls because during the testing of Augustine's urine for succinylcholine, one of the FBI's testing machines had malfunctioned. Given the volatile nature of succinylcholine and the fact that there were questions regarding the preservation of the urine and tissue samples, I find that due process required that Higgs be given more time to prepare what was arguably the most important piece of evidence. I am not persuaded by the majority's argument that Higgs could have effectively presented his arguments regarding the FBI toxicology report by merely cross-examining Montgomery. An effective cross-examination itself requires time and preparation.

For the reasons set forth above, I dissent and would reverse the judgment based on the fact that the district court abused its discretion when it denied Higgs' motion to continue.