# IN THE SUPREME COURT OF THE STATE OF NEVADA

JESSE LAW, AN INDIVIDUAL; MICHAEL MCDONALD, AN INDIVIDUAL; JAMES DEGRAFFENREID, III, AN INDIVIDUAL; DURWARD JAMES HINDLE, III, AN INDIVIDUAL; EILEEN RICE, AN INDIVIDUAL; AND SHAWN MEEHAN, AN INDIVIDUAL, AS CANDIDATES FOR PRESIDENTIAL ELECTORS ON BEHALF OF DONALD J. TRUMP,
Appellants,
vs.
JUDITH WHITMER, AN INDIVIDUAL; SARAH MAHLER, AN INDIVIDUAL; JOSEPH THRONEBERRY, AN INDIVIDUAL; ARTEMESIA BLANCO, AN INDIVIDUAL; GABRIELLE D'AYR, AN INDIVIDUAL; AND YVANNA CANCELA, AN INDIVIDUAL, AS CANDIDATES FOR PRESIDENTIAL ELECTORS ON BEHALF OF JOSEPH R. BIDEN, JR.,
Respondents.

No. 82178

FILED

DEC 08 2020

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

## *ORDER OF AFFIRMANCE*

This is an appeal from a district court order denying an election contest. First Judicial District Court, Carson City; James Todd Russell, Judge.

On November 3, 2020, Nevada voters elected candidates for the office of presidential elector. Following the canvass required by NRS 293.395(2), the Governor of Nevada transmitted a Certificate of Ascertainment to the National Archives on December 2, 2020, which

certifies that the Democratic Party Electors received the highest number of votes cast for presidential electors in the 2020 General Election.[1] On the last day allowed by Nevada law, *see* NRS 293.413(1), appellant Republican Party Electors filed an action contesting the election of the respondent Democratic Party Electors. *See generally* NRS 293.407 (allowing for contest of election to the office of presidential elector); NRS 293.410(2) (identifying the grounds on which an election may be contested). The district court expedited the proceedings, with the parties submitting deposition testimony and other evidence on December 2, 2020, and the court considering that evidence and hearing argument on December 3, 2020. The district court entered a detailed written order the following day.

This appeal was docketed in this court on December 7, 2020, and the parties promptly filed competing motions. Respondents moved for a summary affirmance without briefing, while appellants moved for an expedited briefing schedule (although they asked this court to decide this matter by December 14, they did not propose a specific briefing schedule). We directed the parties to respond to each other's motions by 2 p.m. today, December 8. We also directed the district court clerk to transmit the available portions of the district court record to this court's clerk immediately, which the district court clerk did. Then, having considered the pending motions and responses, we directed the parties to file supplemental briefs by 7 p.m. today. In particular, we ordered appellants to identify by page and paragraph number the specific portions of the district court order they contest. The parties have filed those briefs.

---

[1]The Governor's Certificate of Ascertainment can be viewed at https://www.archives.gov/files/electoral-college/2020/ascertainment-nevada.pdf.

The district court entered a 34-page order, setting forth its findings of fact, conclusions of law, and evidentiary rulings. The district court's order is attached. To prevail on this appeal, appellants must demonstrate error of law, findings of fact not supported by substantial evidence, or an abuse of discretion in the admission or rejection of evidence by the district court. *See Sowers v. Forest Hills Subdivision*, 129 Nev. 99, 105-06, 294 P.3d 427, 432 (2013) (reviewing a district court's factual findings for an abuse of discretion and providing that those findings will not be set aside unless they are clearly erroneous or not supported by substantial evidence); *Weddell v. H20, Inc.*, 128 Nev. 94, 101, 271 P.3d 743, 748 (2012) (stating that questions of law are reviewed de novo, while factual findings are reviewed for substantial evidence). We are not convinced they have done so.[2] In particular, appellants have not demonstrated any legal error in the district court's application of NRS 293.410(2)(c). We also are not convinced that the district court erred in applying a burden of proof by clear and convincing evidence, as supported by the cases cited in the district court's order. And, in any event, the district court further determined that appellants had not met their burden even if it applied a lesser standard. Finally, the district court's order thoroughly addressed the grounds asserted in the statement of contest filed by appellants and considered the evidence offered by appellants even when that evidence did not meet the requirements under Nevada law for expert testimony, *see* NRS 50.275; *Hallmark v. Eldridge*, 124 Nev. 492, 189 P.3d 646 (2008) (explaining requirements for witness to testify as an expert), or for admissibility, *see,*

---

[2]We have not considered any issues or grounds for contesting the election that were not raised below. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981).

*e.g.*, NRS 51.065 (providing that hearsay is inadmissible except as otherwise provided in Nevada law). Despite our earlier order asking appellants to identify specific findings with which they take issue, appellants have not pointed to any unsupported factual findings, and we have identified none. The clerk of this court shall issue the remittitur forthwith. *See* NRAP 2 (allowing the court to suspend any rules in a particular case except for the time to file a notice of appeal). For these reasons, we

ORDER the judgment of the district court AFFIRMED.[3]

_____ , C.J.
Pickering

_____ , J.
Gibbons

_____ , J.
Hardesty

_____ , J.
Parraguirre

_____ , J.
Stiglich

_____ , J.
Silver

---

[3]Given our disposition, we will take no action on the pending motions.

Justice Elissa F. Cadish voluntarily recused herself from participation in the decision of this matter.

cc: Hon. James Todd Russell, District Judge
Harvey & Binnall, PLLC
Weir Law Group LLC
Perkins Coie, LLP/Seattle
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP/Las Vegas
Perkins Coie, LLP/Washington DC
Carson City Clerk

SUPREME COURT
OF
NEVADA

(O) 1947A

5

REC'D & FILED

2020 DEC -4 PM 1:55

AUDREY ROTTWATT

BY

DEPUTY

**IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

**IN AND FOR CARSON CITY**

JESSE LAW, an individual; MICHAEL
MCDONALD, an individual; JAMES
DEGRAFFENREID III, an individual;
DURWARD JAMES HINDLE III, an
individual; EILEEN RICE, an individual;
SHAWN MEEHAN, an individual, as
candidates for presidential electors on behalf of
Donald J. Trump,

Contestants,

vs.

JUDITH WHITMER, an individual; SARAH
MAHLER, an individual; JOSEPH
THRONEBERRY, an individual; ARTEMISA
BLANCO, an individual; GABRIELLE
D'AYR, an individual; and YVANNA
CANCELA, an individual, as candidates for
presidential electors on behalf of Joseph R.
Biden, Jr.,

Defendants.

Case No.: 20 OC 00163 1B

Dept.: 1

**ORDER GRANTING MOTION TO
DISMISS STATEMENT OF CONTEST**

**PROCEDURAL HISTORY**

On November 17, 2020, Contestants—Republican Party presidential elector candidates—filed a statement of contest challenging the results of the 2020 presidential election in Nevada, seeking an order from this Court either declaring President Donald Trump the winner in Nevada and certifying Contestants as the State's duly elected presidential electors, or holding that President-elect Joe Biden's victory "be declared null and void" and that the November 3 election "be annulled and that no candidate for elector for the office of President of the United States of

America be certified from the State of Nevada." Statement of Contest of the Nov. 3, 2020 Presidential Election 20. In orders dated November 19 and 24, 2020, this Court expanded the depositions available to each party from 10 to 15 and shortened the time for notice from seven days to 48 hours. The parties submitted their evidence to the Court on Wednesday, December 2, 2020. Defendants submitted the testimony by deposition of four witnesses and Contestants submitted the testimony by deposition of eight witnesses along with numerous declarations, affidavits, and other documents. The Court held a hearing on December 3, 2020.

## FINDINGS OF FACT

Having reviewed the full evidentiary record submitted by Contestants and Defendants, and having considered, without limitation, all evidence submitted to the Court as well as the parties' written and oral arguments, the Court makes the following findings of fact:

### I.    The Election Results

1.    In the November 3, 2020 General Election for President of the United States, President-elect Joe Biden prevailed over President Donald Trump in the State of Nevada by 33,596 votes.

### II.    The Agilis Machine

2.    The COVID-19 pandemic spurred a sharp increase in mail voting for Nevada's June 2020 Primary Election. The transition to expanded mail voting placed particular stress on larger counties like Clark County because processing and counting mail ballots is time- and labor-intensive. Deposition of Wayne Thorley dated Dec. 1, 2020 ("Thorley Dep.") 12:9–14:11; Deposition of Joseph Gloria dated Dec. 1, 2020 ("Gloria Dep.") 13:11–12.

3.    Accordingly, Clark County looked for solutions to enable it to meet this increased interest in mail voting. It ultimately acquired an Agilis Ballot Sorting System (the "Agilis machine") from Runbeck Election Services ("Runbeck"). Thorley Dep. 14:10–15:18; Gloria Dep. 12:20–13:22.

4.    Runbeck is a well-respected election services company headquartered in Phoenix, Arizona. It provides a suite of hardware and software products that assist with mail ballot sorting

2

and processing, initiative petitions, voter registration, and ballot-on-demand printing. It is also one of the largest printing vendors for ballots in the United States. In 2020 alone, it printed 76 million ballots and mailed 30 million. Runbeck's clients are state and county election officials in the United States. Runbeck does not do work for political parties or candidates. Deposition of Jeff Ellington dated Nov. 3, 2020 ("Ellington Dep.") 8:2–19; 10:4–11; Thorley Dep. 16:1–12; Gloria Dep. 12:20–14:3.

5. The Agilis machine is a ballot-sorting machine similar to those used by the U.S. Postal Service ("USPS"). As a ballot envelope is run through the machine, the Agilis takes a picture of the envelope. It also does preliminary processing to ensure the ballot is appropriate to be counted. For example, the machine scans the envelope to see if it was signed by the voter, weighs the envelope to determine if it properly contains only one ballot, and reads a barcode on the envelope to help ensure that the ballot is for the election that is being processed. The Agilis machine then sorts the mail pieces into those appropriate for counting and those with likely deficiencies, as well as by precinct or district. Ellington Dep. 11:18–13:11.

6. Runbeck sells the Agilis machine with automatic signature verification software licensed from Parascript. Parascript is a preeminent provider of handwriting and signature verification software that is widely used by USPS and financial institutions across the United States. Upwards of 80 percent of bank checks in the United States are verified by Parascript's automatic signature verification technology. Ellington Dep. 13:20–14:24.

7. As offered with the Agilis machine, the automatic signature verification software takes a picture of the signature on the ballot envelope. It then compares the signature from the envelope to a comparator signature from the voter registration files and, using a logarithmic algorithm, scores the signature. If that score is above the threshold setting chosen by the jurisdiction, the ballot is sorted for counting. A ballot below the threshold setting is flagged for further review. Ellington Dep. 13:3–11, 15:25–16:6; Gloria Dep. 12:1–13.

8. Clark County acquired and used the Agilis machine for the June primary. Before acquiring the Agilis, Clark County approached the Office of the Nevada Secretary of State (the

3

"Secretary") to request funding for the acquisition. The Secretary and Clark County engaged in extensive conversations about how the County planned to use the Agilis machine and what exactly it would do for them. Ultimately, the Secretary approved the funding. Thorley Dep. 14:15–15:21, 18:1–19:6; Gloria Dep. 14:4–13.

9. Clark County used the Agilis machine during the June primary and November election. Before each election, Clark County conducted testing on the machine to determine what threshold setting to use. After completing this testing process, the County ultimately set the machine at a setting of 40. More testing was performed after the June primary to confirm the setting was appropriate for the November election. As a result, Clark County continued to use the Agilis machine at a setting of 40 for the November election. Gloria Dep. 16:10–17:4; 22: 1–10.

10. The threshold setting determines what score a signature must be given by the Agilis machine to be accepted. While it operates on a 1 to 100 scale, it does not correlate to a percentage; in other words, a setting of 40 does not represent a 40 percent likelihood that the signature is accurate, nor will a setting of 40 instruct the Agilis machine to accept 40 percent of ballots. Instead, the threshold setting is merely a cutoff for which signature scores will be accepted. Ellington Dep. 16:1–17:9.

11. While the Agilis machine comes preset at 50, that setting does not constitute a recommended setting. Runbeck does not recommend that its customers run the machine at any particular setting. Ellington Dep. 17:10–21, 18:7–12; Gloria Dep. 15:5–22; 16:23–17:4.

12. Instead, Runbeck recommends that its customers do their own testing to determine a setting with which they are comfortable. Clark County complied with this best practice in choosing the setting of 40. Ellington Dep. 19:2–6.

13. Many jurisdictions run their Agilis machines below a threshold setting of 50. Ellington Dep. 17:17–18, 18:17–19:1; Deposition of Scott Gessler dated Dec. 1, 2020 ("Gessler Dep.") 22:16–20.

14. Because the automatic signature verification is a logarithmic algorithm, there is no significant difference in the number of signatures that are verified at a setting of 40 versus a setting

4

of 50. Instead, the rate of verification sees a sudden high rate of change at the two extremes but not in the middle. Any setting between a 15 and 85 would produce substantially similar results. Ellington Dep. 17:12–18:6.

15.     Accordingly, during both the June primary and November election in Clark County, a ballot envelope bearing a signature that was scored 40 or better by the Agilis machine was accepted without further review. Gloria Dep. 11:6–12:13.

16.     If a signature was scored below 40, it was flagged for human verification. Clark County's permanent election personnel were initially trained by a forensic signature expert and former FBI agent, and they developed a training program for temporary staff based on this instruction. During the human verification process, an election worker reviewed the signature against a reference signature on a computer screen. If the reviewer was uncertain about a signature, the signature was passed along for additional review and compared against the voter's entire history of signatures. If uncertainty persisted, the signature was reviewed by Joseph P. Gloria, Clark County's Registrar of Voters, as a final check. If the signature was then rejected, the voter could undertake Nevada's statutory cure process. Gloria Dep. 17:10–20:6.

17.     Accordingly, no ballot was rejected for signature mismatch by Clark County without first being reviewed by Clark County employees. A ballot would only ever be rejected if "at least two employees" agreed that the signature on the envelope differed in "multiple, significant and obvious respects from the signatures of the voter available in" the County's records. Nevada Revised Statutes ("NRS") 293.8874; *see also* Thorley Dep. 17:13–19.

18.     During the November election, roughly 30 percent of signatures were verified by the Agilis machine, while roughly 70 percent were flagged for human verification. Gloria Dep. 12:1–13.

19.     The Agilis machine's verification rate was relatively low because many of the comparator signatures in Clark County's database are low-quality images from the Department of Motor Vehicles ("DMV"). A low-quality image is one with a DPI (dots per inch) below 200. Ellington Dep. 21:12–22:1.

20. When an image is below 200 DPI, the Agilis machine cannot make a match because it will not read the image file as containing a signature. Instead, it will read the image file as a series of squares and pass the signature along for human verification. In other words, low-quality comparator signatures will cause the Agilis machine to not verify signatures; it will not cause the Agilis machine to erroneously accept signatures that are not genuine. Ellington Dep. 19:19–22:1.

21. During the November election, 6,864 ballots were initially rejected by Clark County for signature mismatch, representing 1.51 percent of all mail ballots received. Of those, 5,506 voters (or 80.22 percent of voters whose ballots were rejected) cured their ballots, resulting in 1,358 (or 0.30 percent of) ballots being rejected for signature mismatch. See Deposition of Dr. Michael Herron dated Dec. 2, 2020 ("Herron Dep.") 30:25–32:24, Expert Declaration of Dr. Michael Herron dated Dec. 30, 2020 ("Herron Decl."), 23-24 (Defs.' Ex. 6).

22. Clark County's pre-cure signature mismatch rate of 1.51 percent is nearly equivalent to that of Washoe County, which was 1.53 percent in the 2020 General Election. Washoe County did not use the Agilis machine in processing mail ballots in the 2020 General Election. The signature mismatch rate in the 2016 general election was 0.13 in both Clark County and statewide. *See* Herron Dep. 36:15–39:7; Herron Decl. 25–26.

## III. Electronic Voting Machines

23. Clark County, along with 15 other counties in Nevada, uses Dominion Voting Systems to conduct in-person voting. Thorley Dep. 23:3–11.

### A. In-Person Voting Technology

24. When a voter shows up at a polling place, she must first check in with an election worker. Clark County, like other counties in Nevada, uses an electronic poll book to check the voter in and confirm the voter's identity. Thorley Dep. 26:9–13.

25. First, the election worker will look up the voter on an electronic roster and, upon locating the voter's record, confirm her identity. This process can involve checking more than the voter's name if there are multiple records with the same name. Thorley Dep. 26:13–19.

///

6

26. Next, the election worker will ensure that the voter does not need to make any changes to her voter registration information. Thorley Dep. 26:20–21.

27. Finally, the election worker will provide a pen with a metal screen tip to the voter, which will allow her to sign an electronic tablet to provide a signature. Thorley Dep. 22–24; Gloria Dep. 99:24–100:3.

28. In Clark County, after successfully checking in the voter, the election worker will initialize a voting machine activation card—"voter card"—and provide it to the voter. The voter must insert the voter card into the electronic voting machine for her ballot to appear and to begin the voting process. Clark County uses "vote centers," meaning any voter in the County can vote at any polling location. The voter card ensures that the voter is presented the ballot for her specific precinct. Thorley Dep. 26:5–27:10.

29. When the voter inserts the voter card into the voting machine (also called the "ICX"), the voting machine pulls up the correct ballot, allowing the voter to go through and make selections on a touchscreen. The voter has various opportunities to make changes and review the ballot on the screen itself. Thorley Dep. 27:11–16.

30. Once the voter has reviewed her selections, a printer connected to the voting machine (the voter verified paper audit trail printer, or "VVPAT") flashes a green light before creating a printout of the voter's selections. The printout is printed on a roll of paper—like a receipt from a grocery store cash register—behind a plastic covering, which allows the voter to privately review her selections. The printout is statutorily required for electronic voting machines as an alternative method for voters to confirm the selections made on electronic voting machines. If there is anything wrong with the printer, such as a paper jam or a need for more paper, the printer will flash a red light so that the voter can be assisted. Thorley Dep. 27:17–25, 28:10–22; Gloria Dep. 28:13–21, 42:13–25.

31. A voter can make changes on the touchscreen, if necessary, after reading the printout. Otherwise, the voter touches the "cast-ballot" button on the machine, completing the

7

voting process. The voter will then retrieve the voter card from the machine, hand it to a poll worker, and receive an "I Voted" sticker. Thorley Dep. 27:25–28:9; Gloria Dep. 29:7–12.

32. Voters who check in but do not complete the voting process are known as "fled voters." Fled voters can be explained for various innocuous reasons, including voter confusion or an ultimate decision not to vote. Thorley Dep. 30:11–25; Gloria Dep. 52:14–18.

**B.     Certification and Auditing**

33. These voting systems are subject to extensive testing and certification before each election and are audited after each election. Thorley Dep. 35:12–39:23; Gloria Dep. 31:3–32:7, 33:9–21.

34. For example, the electronic voting systems used by Clark County were certified by the federal government when they were first brought on the market, as well as any time a hardware or software component is upgraded. This certification is done by a voting system test laboratory. Thorley Dep. 36:19–37:12.

35. The electronic voting machines are also tested and certified by the Secretary, who contracts with the Nevada Gaming Control Board for this certification. Thorley Dep. 37:17–38:21.

36. Clark County's electronic voting machines were last inspected by the Gaming Control Board in December 2019 and certified by the Secretary shortly thereafter. Thorley Dep. 39:6–15; Gloria Dep. 31:3–32:7.

37. The voting machines are also audited against a paper trail that is generated, as discussed above, when voters make their selections. A Clark County voting machine will not operate unless it is connected to a printer (the VVPAT), which creates a paper record that voters can review. Thorley Dep. 28:11–29:6; Gloria Dep. 28:13–29:5.

38. After each election, Clark County, like Nevada's other counties, conducts a random audit of its voting machines. Specifically, it compares the paper trail created by the printer against the results recorded by the voting machine to ensure they match. Thorley Dep. 35:12–36:12; Gloria Dep. 33:9–21.

///

8

39. If there are any issues with or discrepancies in the data recorded by Clark's voting machines, or issues with the accuracy of the paper trail created by the printers, then they would appear in this audit; indeed, that is what the audit is designed to catch. Thorley Dep. 36:8–12.

40. Clark County conducted this audit following the November election and there were no discrepancies between the paper audit trail created by the printer and the data from the voting machine. Gloria Dep. 33:9–21.

IV. Previous Lawsuits

41. Several of the issues raised in Contestants' statement have been litigated and resolved in previous state and federal cases.

A. *Kraus v. Cegavske*

42. District Judge James E. Wilson, Jr. concluded that Clark County's use of the Agilis machine is permissible under Nevada law in *Kraus v. Cegavske*, No. 20 OC 00142 1B, slip op. at 12 (Nev. 1st Jud. Dist. Ct. Oct. 29, 2020).

43. During a ten-hour evidentiary hearing, the parties' counsel—including Contestants' counsel, Jesse Binnall—addressed Clark County's use of the Agilis machine. *See, e.g.*, Transcript of Video-Recorded Hearing 19–20, 36–37, 47–56, 70–74, 76–78, 240–43, *Kraus v. Cegavske*, No. 20 OC 00142 1B (Nev. 1st Jud. Dist. Ct. Oct. 28, 2020).

44. Judge Wilson found that "major metropolitan areas including Cook County, Illinois, Salt Lake City, Utah, and Houston, Texas use Agilis," and that the same system was "used for the June primary election," during which "[n]o evidence was presented that the setting used by Clark County causes or has resulted in any fraudulent ballot being validated or any valid ballot invalidated." *Kraus*, slip op. at 4.

45. Judge Wilson concluded that "[t]here is no evidence that any vote that should lawfully not be counted has been or will be counted," and that "[t]here is no evidence that any election worker did anything outside of the law, policy, or procedures." *Id.* at 9.

46. On the merits of the challenge to the Agilis machine, Judge Wilson explained that Assembly Bill 4 ("AB 4")—omnibus election legislation enacted by the Nevada Legislature during

a special session in the summer of 2020—"specifically authorized county officials to process and count ballots by electronic means. Petitioners' argument that AB 4, Sec. 23(a) requires a clerk or employee check the signature on a returned ballot means the check can only be done manually is meritless. The ballot must certainly be checked but the statute does not prohibit the use of electronic means to check the signature." *Id.* at 12 (citation omitted).

47. Judge Wilson rejected the argument that Clark County's use of the Agilis machine violates equal protection, concluding that "[n]othing the State or Clark County has done values one voter's vote over another's." *Id.* at 13.

48. Judge Wilson further determined that the "[p]etitioners [] failed to prove" that Mr. Gloria "has interfered with any right they or anyone else has as an observer" and that "Gloria has not failed to meet his statutory duties . . . to allow members of the general public to observe the counting of ballots." *Id.* at 11.

49. The *Kraus* petitioners filed an emergency motion for immediate relief with the Nevada Supreme Court, which denied the request after concluding that they "ha[d] not demonstrated a sufficient likelihood of success to merit a stay or injunction." *Kraus v. Cegavske*, No. 82018, slip op. at 2–3 (Nev. Nov. 3, 2020).

50. The *Kraus* petitioners subsequently dismissed the appeal. *See Kraus v. Cegavske*, No. 82018, slip op. at 1–2 (Nev. Nov. 10, 2020).

**B. Other Cases**

51. In *Donald J. Trump for President, Inc. v. Cegavske*, Donald J. Trump for President, Inc. (the "Trump Campaign"), the Republican National Committee, and the Nevada Republican Party challenged AB 4 soon after the law was enacted, and the U.S. District Court for the District of Nevada dismissed the lawsuit after concluding that these plaintiffs lacked standing. *See* No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974, at *7 (D. Nev. Sept. 18, 2020).

52. Both the Eighth Judicial District Court and the Nevada Supreme Court denied relief requested by the Election Integrity Project of Nevada and Sharron Angle in a lawsuit alleging, among other claims, that AB 4 violates equal protection. *See Election Integrity Project of Nev. v.*

10

*State ex rel. Cegavske*, No. A-20-820510-C, slip op. at 12 (Nev. 8th Jud. Dist. Ct. Sept. 28, 2020); *Election Integrity Project of Nev. v. Eighth Jud. Dist. Ct.*, No. 81847, slip op. at 6 (Nev. Oct. 7, 2020).

53. On November 5, 2020, another group of plaintiffs, again backed by the Trump Campaign, filed suit in federal court and alleged that Clark County's use of the Agilis machine violates Nevada law; after conducting a hearing and concluding that use of the Agilis machine does not "conflict with the other provisions of the Nevada election laws" and that there was "little to no evidence that the machine is not doing what it's supposed to do, or incorrectly verifying other signatures," the court denied the plaintiffs' motion for temporary restraining order and preliminary injunction. Reporter's Tr. of Proceedings at 79:5–7, 79:24–80:1, *Stokke v. Cegavske*, No. 2:20-cv-02046-APG-DJA (D. Nev. Nov. 6, 2020). The *Stokke* plaintiffs voluntarily dismissed their case. *See* Notice of Voluntary Dismissal Under FRCP 41(a)(1)(A)(i), *Stokke v. Cegavske*, No. 2:20-cv-02046-APG-DJA (D. Nev. Nov. 24, 2020), ECF No. 31.

54. Other lawsuits challenging Clark County's administration of the November election have been dismissed on various grounds. *See, e.g.*, *Becker v. Gloria*, No. A-20-824878-W, slip op. at 4 (Nev. 8th Jud. Dist. Ct. Dec. 2, 2020) ("The Court finds that Plaintiff has offered no evidence sufficient to find any error on the part of either Clark County or Registrar Gloria that would warrant granting the relief sought here."); *Rodimer v. Gloria*, No. A-20-825130-W, slip op. at 4 (Nev. 8th Jud. Dist. Ct. Nov. 25, 2020); *Marchant v. Gloria*, No. A-20-824878-W, slip op. at 4 (Nev. 8th Jud. Dist. Ct. Nov. 23, 2020).

## V. Evidence Presented

### A. Contestants' Evidence

55. The Court's orders required Contestants to disclose all witnesses and provide Defendants with all evidence they intended to use at the hearing in this matter by 5:00 p.m. on November 25, 2020.

56. Contestants did not issue their first deposition notices until Friday, November 27, 2020.

57. Much of Contestants' evidence consists of non-deposition evidence in the form of witness declarations. These declarations fall outside the scope of the contest statute, which provides that election contests "shall be tried and submitted so far as may be possible upon depositions and written or oral argument as the court may order." NRS 293.415. The reason for this is to allow for the cross-examination of the deponent under oath.

58. These declarations also constitute hearsay, as they are out-of-court statements offered in evidence to prove the truth of the matters asserted. *See* NRS 51.035, 51.065; *Cramer v. State*, 126 Nev. 388, 392, 240 P.3d 8, 11 (2010) ("An affidavit is generally inadmissible hearsay."). Most of these declarations were self-serving statements of little or no evidentiary value.

59. The Court nonetheless considers the totality of the evidence provided by Contestants in reaching and ruling upon the merits of their claims.

**B.    Contestants' Expert Evidence**

**i.    Michael Baselice**

60. Contestants offered Mr. Baselice to opine on the incidence of illegal voting in the 2020 General Election based on a phone survey of voters.

61. The Court questions Mr. Baselice's methodology because he was unable to identify the source of the data for his survey and conducted no quality control of the data he received. Baselice Dep. 29:13–30:8, 34:24–35:21, 57:13–58:14.

**ii.    Jesse Kamzol**

62. Contestants offered Mr. Kamzol to opine that significant illegal voting occurred in Nevada during the 2020 General Election, based on his analysis of various commercially available databases of voters.

63. The Court questions Mr. Kamzol's methodology because he had little to no information about or supervision over the origins of his data, the manner in which it had been matched, and what the rate of false positives would be. Additionally, there was little or no verification of his numbers. Kamzol Dep. 58:6–11, 58:15–17, 59:22–24.

///

12

### iii. Scott Gessler

64. Contestants offered Mr. Gessler to opine on the transition to and administration of mail voting.

65. Mr. Gessler's report lacked citations to facts and evidence that he used to come to his conclusions and did not include a single exhibit to support of any of his conclusions.

66. The Court finds that Mr. Gessler's methodology is unsound because he based nearly all his opinions on a handful of affidavits that he took no steps to corroborate through independent investigation. Gessler Dep. 44:12–14, 48:11–25, 50:8–22, 66: 1–7.

### C. Defendants' Evidence

67. Defendants put forth the testimony by deposition of Wayne Thorley, Nevada's former Deputy Secretary of State for Elections. This testimony is credible because of Mr. Thorley's experience, lack of bias, and first-hand knowledge of the subjects he testified to.

68. Defendants put forth the testimony by deposition of Jeff Ellington, President and Chief Operating Office of Runbeck, which manufactures the Agilis machine. This testimony is credible because of Mr. Ellington's experience, lack of bias, and first-hand knowledge of the subjects he testified to.

69. Defendants put forth the testimony by deposition of Joseph P. Gloria, the Registrar of Voters for Clark County. This testimony is credible because of Mr. Gloria's experience, lack of bias, and first-hand knowledge of the subjects he testified to.

70. Defendants put forth the testimony by deposition of Dr. Michael Herron. Dr. Herron is qualified as an expert in the areas of election administration, voter fraud, survey design, and statistical analysis. Dr. Herron holds advanced degrees in statistics and political science; has published academic papers in peer-reviewed journals about election administration and voter fraud; and has an extensive record of serving as an expert on related topics in litigation before numerous courts, none of which has found that his testimony lacks credibility.

71. The Court finds the testimony of Dr. Herron credible and his methodology and conclusions reliable. His testimony is relevant and limited in scope because it considered each

13

ground for contest, both individually and within the context of Nevada's registration and voting system, and the prevalence of voter fraud nationwide and in Nevada. His methodology is reliable because it is similar to that which he uses in his published work and because he produced all of the data on which he relied, such that his conclusions are testable by others in his field.

## VI. Illegal or Improper Votes

### A. Voter Fraud Rates

72. Contestants allege that fraud occurred at multiple points in the voting process in Nevada in rates that exceed the margin of victory in the presidential race. Based on Dr. Herron's analysis, the Court finds there is no evidence that voter fraud rates associated with mail voting are systematically higher than voter fraud rates associated with other forms of voting. *See* Herron Dep. 17:7–13; Herron Decl. 17.

73. Based on Dr. Herron's analysis, the Court finds there is no evidence that voter fraud rates associated with mail voting are systematically higher than voter fraud rates associated with other forms of voting. *See* Herron Dep. 17:7–13; Herron Decl. 17.

74. After examining voter turnout in Nevada and constructing a database of voter fraud instances in the State from 2012 to 2020, Dr. Herron concluded that out of 5,143,652 ballots cast in general and primary elections during that timeframe (not including the 2020 General Election), the illegal vote rate totaled at most only 0.00054 percent. Herron Dep. 22:19–24:7; Herron Decl. 18–21.

75. Dr. Herron considered the academic literature on voter fraud in the United States (including published papers that he has authored) and analyzed publicly available election data in Clark County to evaluate Contestants' allegations of fraud. Based on his study, Dr. Herron concluded that Contestants' allegations "strain credulity." Herron Dep. 41:4–18; Herron Decl. 28 (explaining that Contest implied that double-voting rate experienced by mail-in voters in Nevada was at least 89 times greater than conservative academic estimate); Herron Dep. 45:2–46:24; Herron Decl. 33 (explaining that only 537 ballots arrived after deadline in Clark County and that there is no evidence that single one was counted).

14

76. Dr. Herron's comparative analysis across counties of signature mismatch rates was similar to an analysis he conducted in North Carolina's Ninth Congressional District in 2018, during which publicly available absentee ballot data was consistent with allegations of fraud. His analysis there was credited by the North Carolina State Board of Elections. Herron Dep. 9:19–10:9. In contrast to his study in North Carolina, Dr. Herron's comparative analysis in the 2020 Nevada election revealed no irregularities across counties. *See* Herron Dep. 33:9–34:25 (finding nearly identical signature mismatch rates in Clark County and Washoe County despite that one uses the Agilis machine and one does not).

77. Based on his evaluation of Contestants' allegations, Dr. Herron concluded that "none of the grounds [in the Contest] contains persuasive evidence [(1)] that there were fraudulent activities associated with the 2020 General Election in particular [or] the presidential election in Nevada; [(2)] that these fraudulent activities led to fraudulent votes, [or (3)] that these allegedly fraudulent votes affected the vote margin of 33,596 . . . that separates Joe Biden and Donald Trump in Nevada." Herron Dep. 25:1–17; Herron Decl. 1, 21. The Court credits these findings and accepts them as its own.

78. Dr. Herron's testimony is buttressed by Contestants' own expert witness, Mr. Gessler, who also testified that he has no personal knowledge that any voting fraud occurred in Nevada's 2020 General Election. Gessler Dep. 7:3–9, 40:13–12.

79. Based on this testimony, the Court finds that there is no credible or reliable evidence that the 2020 General Election in Nevada was affected by fraud. Herron Dep. 56:19–57:21.

**B. Provisional Ballots**

80. Contestants allege problems and irregularities with the provisional balloting process, including that certain voters were allowed to vote without proper Nevada identification and that the consequences of voting provisionally were not explained to voters.

81. The record does not support a finding that election officials counted ballots cast by same-day registrants who only provided proof of a DMV appointment in place of a Nevada photographic identification. *Cf.* Doe 3 Dep. 38:7–13, 41:6–8 (testifying that voters who provided

only proof of DMV appointments after election day were given provisional ballots, but admitting that she did not participate in counting of provisional ballots and did not know whether any such ballots were counted); Doe 5 Decl. (LAW 000462) (hearsay declaration stating that voters without identification could make DMV appointment and vote, but not alleging that this process was improper or illegal).

82. The record does not support a finding that any provisional voters were wrongfully disenfranchised because of directions provided by election officials or because they were not given an opportunity to cure their ballots. *Cf.* Gloria Dep. 55:5–56:11 (testifying that all provisional voters received a set of paperwork explaining why they voted provisionally).

83. The record does not support a finding that voters were made to cast provisional ballots on election day and then not given the opportunity to cure their lack of identification. *Cf.* Doe 3 Dep. 38:7–13, 41:6–8 (testifying that voters with DMV appointments after election day were given provisional ballots, but admitting that she did not participate in counting of provisional ballots and not testifying that such voters were not given opportunity to cure); Huff Decl. (LAW 001689–92) (hearsay declaration alleging various issues with cure process, but never identifying any voters who were denied the opportunity to cure).

84. The record does not support a finding that same day registrants with out-of-state identification were permitted to vote a regular, rather than provisional, ballot. *Cf.* Doe 1 Dep. (describing that such voters were made to vote provisional ballots to be later verified).

C. **Mismatched Signatures**

85. Contestants assert that the Agilis machine consistently malfunctioned and accepted invalid signatures because the machine setting was set impermissibly low and approved signatures based on low quality reference images.

86. The record does not support a finding that the Agilis machine functioned improperly and accepted signatures that should have been rejected during the signature verification process.

87.     The record does not support a finding that election workers counted ballots with improper signatures that should have been rejected. *Cf.* Blanco Decl. (LAW 000238) (hearsay declaration asserting that single signature from Clark County did not appear to match, but providing no evidence that it was not the voter's signature); Cordell Criddle Decl. (LAW 000364) (hearsay declaration alleging that illegible signature was nevertheless accepted, but not that vote was illegal); Debra Criddle Decl. (LAW 000364) (same); Doe 6 Decl. (LAW 000454) (hearsay declaration alleging several instances where signatures appeared to have been signed by others assisting voters, but not providing evidence that this assistance was unlawful).

88.     The record does not support a finding that election workers authenticated, processed, or counted ballots that presented problems and irregularities under pressure from election officials. *Cf.* Doe 2 Dep. 53:19–54:18 (testifying that ballots with purportedly strange signatures were counted, but admitting that she did not see comparator signatures and could not confirm that these were not voters' actual signatures); Doe 3 Dep. 43:15–20 (testifying that on election day she was instructed not to score or surrender ballots, but not that any unlawful ballots were counted as result).

89.     The record does not support a finding that illegal ballots were cast because the signature on the ballot envelope did not match the voter's signature. *Cf.* Blanco Decl. (LAW 000238) (hearsay declaration asserting that single signature from Clark County did not match, but providing no evidence that signature was not voter's); Cordell Criddle Decl. (LAW 000364) (hearsay declaration alleging that illegible signature was nevertheless accepted, but not that vote was illegal); Debra Criddle Decl. (LAW 000364) (same); Doe 6 Decl. (LAW 000454) (hearsay declaration alleging several instances where signatures appeared to have been signed by others assisting voters, but not providing evidence that this assistance was unlawful).

///

**D. Illegal Votes from In-Person Voting Technology**

90. Contestants allege that 1,000 illegal or improper votes were cast and counted as a result of maintenance and security issues with voting machines and that 1,000 legal votes were not counted due to issues with voting machines.

91. The record does not support a finding that maintenance and security issues resulted in illegal votes being cast and counted or legal votes not being counted. *See* Gloria Dep. 33:9–21, 36:8–12 (testifying that the voting machines were audited against a paper trail and that audit turned up no discrepancies).

**E. Ineligible Voters and Double Voting**

92. Contestants allege that voters were sent and cast multiple ballots and otherwise double voted, that non-Nevada residents cast ballots and those ballots were counted, and that numerous persons arrived to vote in-person on election day only to find out that a mail ballots was cast in their name already.

93. The record does not support a finding that any Nevada voter voted twice. *See* Doe 4 Dep. 10:6–13 (testifying that two voters he checked in were not allowed to vote because of record that they already voted).

94. The record does not support a finding that any individuals were sent and cast multiple mail ballots. *Cf.* Negrete Decl. (LAW 001626) (hearsay declaration alleging that she received two ballots, one each for her married and maiden names, but not that she or anyone else cast multiple votes); Finley Decl. (LAW 004944) (hearsay declaration alleging that voter received two ballots, but providing no evidence that ballot was cast or counted).

95. The record does not support a finding that numerous voters arrived to vote at their respective polling places only to be informed that a mail ballot had already been received on their behalf when, in fact, the voter had not submitted a mail ballot. *Cf.* Doe 3 Dep. 36:18–25, 37:1–18 (testifying that single unidentified man arrived at her polling place and claimed that he did not cast mail ballot allegedly received by election officials, but not providing any corroborating evidence);

Doe 4 Dep. 10:6–13 (testifying that two voters he checked in were not allowed to vote because of record that they already voted, but not demonstrating whether these voters had in fact cast ballots).

96. The record does not support a finding that election officials counted mail ballots from voters who also voted in other states. *Cf.* Doe 2 Dep. 56:15–25 (testifying that she saw ballots arrive from out of state but admitting that she did not know whether they were lawfully cast); Doe 3 Dep. 12:8–16 (testifying that she was asked to accept a voter's California identification with Nevada address and was instructed to give them a provisional ballot, but not that voter had also voted in California).

97. The record does not support a finding that election officials counted ballots from voters who did not meet Nevada residency requirements. *Cf.* Doe 2 Dep. 56:15–25 (testifying that voters were allowed to cast ballots without presenting identification, but not that voters did not meet residency requirements); Doe 4 Dep. 10:14–11:12, 40:7–23 (testifying to belief that individuals with out-of-state identification were allowed to vote, but admitting that he did not know if these individuals voted after they were directed to team leaders); Linda Smith Decl. (LAW 004650) (hearsay declaration describing voters arriving with out-of-state license plates, but not claiming that these voters were ineligible to vote in Nevada);*see* Thorley Dep. 47:1–48:12 (testifying that Nevada directs the USPS not to forward ballots and that ballots are mailed as marketing mail, which does not include mail forwarding, a feature that requires additional payment).

**F.     Ballot Issues**

98. Contestants allege that Clark County election workers were pressured to push ballots through despite deficiencies.

99. The record does not support a finding that Clark County election workers were pressured to process and count ballots that presented problems and irregularities. *Cf.* Doe 2 Dep. 53:19–54:18 (testifying that ballots with purportedly strange signatures were counted, but admitting that she did not see comparator signatures and could not confirm that these were not

19

voters' actual signatures); Doe 3 Dep. 43:15–20 (testifying that on election day she was instructed not to score or surrender ballots, but not that any unlawful ballots were counted as result).

G. **Deceased Voters**

100. Contestants allege that votes from deceased voters were improperly cast and counted.

101. The record does not support a finding that, as Contestants allege, 500 votes were illegal or improper because they were cast by deceased voters. *See* Thorley Dep. 44:2–45:24 (testifying to the process in place to maintain voter rolls, including removing confirmed deceased voters); Gloria Dep. 63:24–64:8, 90:7–23 (same); Hartle Decl. (LAW 000260–61) (hearsay declaration asserting only that single vote from deceased wife was counted during November election); 2020 General Election Rejection Log (LAW 004366, 004527) (showing only two "voter is deceased" entries).

H. **Voter Impersonation**

102. Contestants allege that persons cast mail ballots in other persons' names.

103. The record does not support a finding that ballots that were completed and submitted by anyone other than the proper voters. *Cf.* Doe 3 Dep. 14:8–14, 35:1–5 (testifying that unidentified persons near purported Biden-Harris bus next to polling location prefilled mail ballots and put them in pink ballot envelopes, but admitting that she did not see these ballots cast and cannot confirm that these ballots were counted); Walters Decl. (LAW 000266) (hearsay declaration claiming that occupants of van seen following USPS truck took mail ballots from mailboxes, but providing no evidence that these ballots were cast and counted); Garrett Smith Decl. (LAW 000453) (hearsay declaration claiming that he did not vote and that "[a] search of the Clark County web site [] disclosed that a ballot in my name was accepted by the county on November 7, 2020," but providing no evidence that this was his ballot and not ballot of someone with same name).

## I. Untimely Ballots

104. Contestants allege that election officials counted ballots that arrived after the deadline for submitting them.

105. The record does not support a finding that election officials counted untimely mail ballots that were submitted after deadlines.

## J. Other Allegedly Illegal or Improper Votes

106. Contestants allege that Nevada failed to properly maintain its voter lists resulting in illegal votes cast and counted, and that the postal service was directed to violate USPS policy and improperly deliver ballots.

107. The record does not support a finding that Nevada failed to cure its voter lists to reflect returned ballots during the 2020 primary election and that, as a result, ballots were delivered to addresses where no known voter lives and were cast and counted at all or in an amount equal to or greater than 33,596. *Cf.* Walter Decl. (LAW 000266) (hearsay declaration alleging that he received ballot for individual who never lived at his address, but not demonstrating that the ballot was voted or counted); Gessler Dep. 41:23–42:10 (testifying that he has no knowledge of how Nevada maintains its voter rolls and that he knows of no one who is improperly included in those rolls).

108. The record does not support a finding that USPS letter carriers were directed to violate USPS policy by delivering mail ballots to addresses where the addressee of the ballot was known to be deceased, known to have moved from that address, or had no affiliation with that address at all. Thorley Dep. 46:18–48:14; *cf.* Doe 7 Decl. (LAW 000265) (hearsay declaration alleging that deceased mother's ballot was forwarded to son in California, but not demonstrating that person was actually deceased and not simply living with son temporarily); *id.* (alleging that USPS supervisor instructed her to forward ballot to deceased person in California, but providing no evidence that such ballot was returned as voted).

109. Despite two of Contestants' experts testifying to "questionable ballots" and "illegal ballots," Baselice Dep. 52:20–25 ("questionable ballots"); Kamzol Dep. 53:10–14 ("illegal

ballots"), neither provided evidence to support Contestants' allegations regarding the presence of illegal votes in the 2020 presidential election. *See* Herron Dep. 59:22–60:12, 68:13–69:12 (testifying that neither Mr. Baselice nor Mr. Kamzol disclosed the data underlying their analysis); Baselice Dep. 24:7–15 (explaining that he did not participate in compiling the data he used and "shouldn't even surmise" "what the original source of the data was"); Kamzol Dep. 58:6–59:15 (explaining that he did not know how the matching work to enhance the data he used was performed); Baselice Dep. 60:8–61:17 (acknowledging that he could not determine how many "questionable" ballots were actually counted, contained votes in the presidential election, or were cast for a particular candidate); Kamzol Dep. 92:4–16 (same). Little or no verification of numbers was done by Mr. Kamzol.

## VII.    Observation of the Ballot Processing and Counting Process

110.    The record does not support a finding that Clark County's policy for observation of ballot counting and ballot duplication was designed to shield voter fraud or actually led to voter fraud. Gessler Dep. 64:16–66:21 (testifying he has no knowledge of Nevada law relating to voting observation and no personal knowledge of how Clark County allowed observation of ballot counting and ballot duplication).

111.    The record does not support a finding that election workers marked choices for any unfilled elections or questions on duplicated ballots. *Cf.* Fezza Decl. (LAW 000257) (hearsay declaration describing ballot duplication process, but providing no evidence that anything unscrupulous occurred and noting that duplication teams were comprised of members of opposite parties, that each team "worked well together," and that "getting things done right was encouraged over speed"); Taylor Decl. (LAW 001749) (hearsay declaration describing ballot duplication process, but providing no evidence that anything unscrupulous occurred); Kraus Decl. (LAW 000440) (similar); Stewart Decl. (LAW 000456) (similar).

112.    The record does not support a finding that members of the public were denied the right to observe the processing and tabulation of mail ballots. *Cf.* Fezza Decl. (LAW 000257) (hearsay declaration asserting that observers were confined to "tiny, taped off area" in corner of

room, but admitting that observers were always present and given access); Kraus Decl. (LAW 000441) (hearsay declaration alleging insufficient access to Clark County's facilities for "meaningful observation," but confirming he was consistently given access to facilities); Taylor Decl. (LAW 001749) (similar); Percin Decl. (LAW 001642–88) (similar); Stewart Decl. (LAW 000456) (similar); Gloria Dep. 61:1–7 (explaining that observers were stationed in pre-designated locations that ensured social distancing).

113. In *Kraus*, Judge Wilson found that Clark County had not interfered with any individual's statutory right to observe ballot processing. *Kraus*, slip op. at 10–11 ("Petitioners have failed to prove Registrar Gloria has interfered with any right they or anyone else has as an observer."). The Court adopts this finding of fact as its own.

## VIII.  Candidate Misconduct

### A.  The Nevada Native Vote Project

114. The record does not support a finding that groups or individuals linked to the Biden-Harris campaign offered or gave, directly or indirectly, anything of value to manipulate votes in this election or otherwise alter the outcome of the election. *Cf.* LAW 004662–751 (depicting only two posts including Biden-Harris paraphernalia, neither of which were affiliated with Nevada Native Vote Project or Biden-Harris campaign). The record also does not support a finding that any group or individual offered anything of value to voters to manipulate the voters' choice for president. *Cf.* LAW 000274–358 (showing purported Facebook screenshots from groups and individuals, but not demonstrating that they offered anything of value to alter outcome of election).

115. Although the Nevada Native Vote Project ("NNVP") organized voter drives, that organization expressly disclaimed any relationship with President-elect Biden's or any other political campaign. *See* Official Statement from the Nevada Native Vote Project ("The NNVP is a non-partisan, non-profit organization that is dedicated to engaging the Native community in their Constitutional right to vote. Regardless of party affiliation, the ability to make your voice heard and ensure the Native perspective is present in every determination made on the ballot is of the utmost importance.").

23

116. The record does not support a finding that NNVP or any other group or individual engaged in voting drives acted on behalf of Defendants or President-elect Biden. *Cf.* LAW 000274–358 (showing purported Facebook screenshots from groups and individuals, but not demonstrating any partisan activity linked to Biden-Harris campaign).

**B.    The Biden-Harris Bus**

117. The record does not support a finding that multiple ballots were filled out against a bus bearing the Biden-Harris emblem outside a polling place in Clark County. *Cf.* Doe 3 Dep. 14:13–19:7. While Doe 3 testified to alleged ballot-stuffing occurring in broad daylight outside a busy polling location in Nevada's most populous county, no other witness corroborated Doe 3's account. The Court finds Doe 3's account not credible.

118. The record does not support a finding that the Biden-Harris campaign paid anything of value for anyone to alter votes. *Cf.* Doe 3 Dep. 23:21–24:10 (admitting that she had no hard evidence tying activities she saw to Democratic candidates); *id.* 35:1–8 (admitting to not knowing whether these allegedly unlawful ballots were accepted and counted).

CONCLUSIONS OF LAW

**I.    Expert Evidence by Contestants**

119. "To testify as an expert witness . . . , the witness must satisfy the following three requirements: (1) he or she must be qualified in an area of 'scientific, technical or other specialized knowledge' (the qualification requirement); (2) his or her specialized knowledge must 'assist the trier of fact to understand the evidence or to determine a fact in issue' (the assistance requirement); and (3) his or her testimony must be limited 'to matters within the scope of [his or her specialized] knowledge' (the limited scope requirement)." *Hallmark v. Eldridge*, 124 Nev. 492, 498, 189 P.3d 646, 650 (2008) (alteration in original) (quoting NRS 50.275); *see also Higgs v. State*, 126 Nev. 1043 1, 16, 222 P.3d 648, 658 (2010).

120. As reflected herein, the Court finds that the expert testimony provided by Contestants was of little to no value. The Court did not exclude consideration of this evidence, which it could have, but gave it very little weight.

121. To determine whether these three requirements are satisfied, Nevada courts consider several non-exhaustive factors. *See Higgs*, 126 Nev. at 16–17, 222 P.3d at 657–58.

122. For the qualification requirement, the Court must consider the witness's "(1) formal schooling and academic degrees, (2) licensure, (3) employment experience, and (4) practical experience and specialized training." *Hallmark*, 124 Nev. at 499, 189 P.3d at 650–51 (footnotes omitted).

123. For the assistance requirement, the expert's testimony must be (1) relevant and (2) reliable. *Id.* at 500, 189 P.3d at 651; *see also Perez v. State*, 129 Nev. 850, 858, 313 P.3d 862, 867–68 (2013) ("Evidence is relevant when it tends 'to make the existence of any fact that is of consequence to the determination of the action more or less probable.'" (quoting NRS 48.015)); *Hallmark*, 124 Nev. at 500–01, 189 P.3d at 651–52 ("In determining whether an expert's opinion is based upon reliable methodology, a district court should consider whether the opinion is (1) within a recognized field of expertise; (2) testable and has been tested; (3) published and subjected to peer review; (4) generally accepted in the scientific community . . . ; and (5) based more on particularized facts rather than assumption, conjecture, or generalization." (footnotes omitted)).

124. For the limited scope requirement, the expert testimony must be related to the "highly particularized facts" of the case, *Higgs*, 126 Nev. at 20, 222 P.3d at 660, and fall within the scope of the witness's specialized knowledge. *See Perez*, 129 Nev. at 861, 313 P.3d at 869.

125. As reflected above, this Court gave very little weight to Contestants' experts and could possibly have excluded their testimony under the above stated standards. The Court is concerned about the failure of these experts to verify the data they were relying on.

126. The Court nonetheless considers Contestants' proffered expert testimony in reaching and ruling upon the merits of Contestants' claims.

II.    **Issue Preclusion**

127. Under Nevada law, issue preclusion applies when (1) the issue decided in the prior litigation is identical to the issue in the current action; (2) the initial ruling was on the merits and

25

has become final; (3) the party against whom the judgment is asserted was a party or in privity with a party to the prior litigation; and (4) the issue was necessarily and actually litigated. *Five Star Cap. Corp. v. Ruby*, 124 Nev. 1048, 1055, 194 P.3d 709, 713 (2008).

128. Contestants' challenges to Clark County's use of the Agilis machine and its observation policies are identical to issues raised by the *Kraus* petitioners because two challenges are the same and the same facts underlie these challenges and the *Kraus* claims. *See LaForge v. State, Univ. & Cmty. Coll. Sys.*, 116 Nev. 415, 420, 997 P.2d 130, 134 (2000); *see also Kraus*, slip op. at 12–13.

129. Contestants' challenge to an alleged lack of meaningful observation was also raised and addressed in *Kraus*. *See* slip op. at 10–11, 13.

130. This Court issued a thorough, well-reasoned opinion in *Kraus* denying the petitioners mandamus relief, which constituted a final decision on the merits because it was neither tentative nor subject to further determination. *See Kirsch v. Traber*, 134 Nev. 163, 166–67, 414 P.3d 818, 821–22 (2018); *Hoffman v. Second Jud. Dist. Ct.*, No. 60119, 2013 WL 7158424, at *4 (Nev. Dec. 16, 2013).

131. As Trump electors, Contestants are in privity with the Kraus petitioners— specifically, the Trump Campaign and Nevada Republican Party—because they were "nomin[ated]" and "select[ed]" to serve as electors by the Nevada Republican Party, NRS 298.035(1), and are functionaries of the Trump Campaign. *See* NRS 298.065; NRS 298.075; *see also Chiafalo v. Washington*, 140 S. Ct. 2316, 2322 (2020). Contestants are thus "sufficiently close" to, such that their interests were "adequate[ly] represent[ed]" by, the *Kraus* petitioners. *Mendenhall v. Tassinari*, 133 Nev. 614, 618, 403 P.3d 364, 369 (2017) (first quoting *Vets N., Inc. v. Libutti*, No. CV-01-7773-DRHETB, 2003 WL 21542554, at *11 (E.D.N.Y. Jan. 24, 2003); and then quoting *Alcantara ex rel. Alcantara v. Wal-Mart Stores, Inc.*, 130 Nev. 252, 261, 321 P.3d 912, 917 (2014)); *cf. In re Coday*, 130 P.3d 809, 816–17 (Wash. 2006).

///

///

26

132. The issues relating to the Agilis machine and meaningful observation of tabulation were necessarily and actually litigated in *Kraus* because they were properly raised and submitted for determination. *See Alcantara*, 130 Nev. at 262, 321 P.3d at 918.

133. Each of the four requirements for issue preclusion is therefore satisfied as to Contestants' grounds for contest related to the lawfulness of the Agilis machines and meaningful observation of ballot tabulation

134. While issue preclusion provides alternative grounds to dispose of these issues, the Court reaches and rules on the merits of all of Contestants' claims.

### III. Grounds for Contests

135. Although Nevada has not addressed this issue, the Court believes that Contestants are required to prove the grounds for their contest by clear and convincing evidence. *See, e.g., Gooch v. Hendrix*, 851 P.2d 1321, 1328 (Cal. 1993); *Bazydlo v. Volant*, 647 N.E.2d 273, 276 (Ill. 1995); *Adair Cnty. Bd. of Elections v. Arnold*, No. 2015-CA-000661-MR, 2015 WL 5308132, at *6 (Ky. Ct. App. Sept. 11, 2015); *Snyder v. Glusing*, 520 A.2d 349, 357 (Md. 1987); *Drummond v. Town of Virginia City*, 833 P.2d 1067, 1070 (Mont. 1992); *Harmon v. Baldwin*, 837 N.E.2d 1196, 1201 (Ohio 2005) (per curiam); *Quinn v. City of Tulsa*, 777 P.2d 1331, 1341 (Okla. 1989); *Thomas v. Penfold*, 541 P.2d 1065, 1067 (Or. 1975); *Gonzalez v. Villarreal*, 251 S.W.3d 763, 773 (Tex. Ct. App. 2008).

136. This higher standard of proof is appropriate in election contests because it "adequately balances the conflicting interests in preserving the integrity of the election and avoiding unnecessary disenfranchisement of qualified absentee voters." *Bazydlo*, 647 N.E.2d at 276 (quoting *Bazydlo v. Volant*, 636 N.E.2d 1107, 1110 (Ill. App. Ct. 1994)); *accord Sadler v. Connolly*, 575 P.2d 51, 55 (Mont. 1978) ("The underlying basis for [the clear and convincing evidence] standard is that an election contest . . . , if successful, has the serious effect of disenfranchisement of the voters." (citing *Thornton v. Johnson*, 453 P.2d 178, 182 (Or. 1969) (per curiam))).

///

137. "In Nevada, a plaintiff must prove a general civil fraud claim, which requires intent to defraud, with clear and convincing evidence." *Nellis Motors v. State*, 124 Nev. 1263, 1267, 197 P.3d 1061, 1064 (2008).

138. "[C]lear and convincing evidence must be 'satisfactory' proof that is 'so strong and cogent as to satisfy the mind and conscience of a common man, and so to convince him that he would venture to act upon that conviction in matters of the highest concern and importance to his own interest. It need not possess such a degree of force as to be irresistible, but there must be evidence of tangible facts from which a legitimate inference . . . may be drawn.'" *In re Discipline of Drakulich*, 111 Nev. 1556, 1566, 908 P.2d 709, 715 (1995) (alteration in original) (quoting *Gruber v. Baker*, 20 Nev. 453, 477, 23 P. 858, 865 (1890)).

139. However, even if a preponderance of the evidence standard was used, the Court concludes that Contestants' claims fail on the merits there under or under any other standard.

**A. Contestants did not prove that there was a "malfunction of any voting device or electronic tabulator, counting device or computer in a manner sufficient to raise reasonable doubt as to the outcome of the election."**

140. Contestants' evidence does not establish by clear and convincing proof, or under any standard of evidence, that "there was a malfunction of any voting device or electronic tabulator, counting device or computer in a manner sufficient to raise reasonable doubt as to the outcome of the election." NRS 293.410(2)(f).

141. A "malfunction" is "[a] fault in the way something works," *Malfunction, Black's Law Dictionary* (11th ed. 2019), and "a failure to operate or function in the normal or correct manner," *Malfunction, Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *see also Otis Elevator Co. v. Reid*, 101 Nev. 515, 520, 706 P.2d 1378, 1381 (1985) (describing incidents where elevator operated differently than "normal" as "malfunctions").

142. Contests did not prove under any standard of proof that the Agilis machine malfunctioned.

///

///

28

143. Contestants did not prove under any standard of proof that the Agilis machine malfunctioned in a manner sufficient to raise reasonable doubt as to the outcome of the election.

144. Contests did not prove under any standard of proof that the electronic voting machines malfunctioned in a manner sufficient to raise reasonable doubt as to the outcome of the election.

**B.** **Contestants did not prove that "[i]llegal or improper votes were cast and counted," and/or "[l]egal and proper votes were not counted . . . in an amount that is equal to or greater than the margin between the contestant and the defendant, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election."**

145. Contestants evidence does not establish by clear and convincing proof, or under any standard of evidence, that "[i]llegal or improper votes were cast and counted," and/or "[l]egal and proper votes were not counted . . . in an amount that is equal to or greater than the margin between the contestant and the defendant, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election." NRS 293.410(2)(c).

146. "Illegal or improper votes" are those that could not have been lawfully cast and therefore should not be counted. *See, e.g., Mahaffey v. Barnhill,* 855 P.2d 847, 850 (Colo. 1993) (defining votes cast by those ineligible to vote as "illegal votes"); *Turner v. Cooper,* 347 So. 2d 1339, 1341 (Ala. 1977) (describing "illegal votes" as those cast by unqualified voters); *Grounds v. Lawe,* 193 P.2d 447, 449 (Ariz. 1948) (explaining that trial court found "fifteen illegal votes" because "fifteen [votes] had been cast by persons not qualified to vote"); *Harris v. Stewart,* 193 So. 339, 341 (Miss. 1940) (describing "illegal votes" as those cast by someone "not a qualified voter"); *Jaycox v. Varnum,* 226 P. 285, 288 (Idaho 1924) (similar); *Montoya v. Ortiz,* 175 P. 335, 337 (N.M. 1918) ("There was no question raised as to illegal votes. All voters who voted at the election were concededly qualified voters."); *Horton v. Sullivan,* 86 A. 314, 314 (R.I. 1913) (using "illegal votes" to describe those cast by "illegal voters").

147. Contestants did not prove under any standard of proof that illegal votes were cast and counted, or legal votes were not counted at all, due to voter fraud, nor in an amount equal to

or greater than 33,596, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election.

148. Contestants did not prove under any standard of proof that voters who were given provisional ballots cast illegal votes which were then counted, or voters who were given provision ballots cast legal votes which were not counted at all, nor in an amount equal to or greater than 33,596, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election.

149. Contestants did not prove under any standard of proof that illegal votes were cast and counted that should have been rejected during the signature verification process, or legal votes were not counted that should have been accepted during the signature verification process at all, nor in an amount equal to or greater than 33,596, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election.

150. Contestants did not prove under any standard of proof that illegal votes were cast and counted, or legal votes were not counted at all, due to issues with in-person voting technology, nor in an amount equal to or greater than 33,596, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election.

151. Contestants did not prove under any standard of proof that illegal votes by ineligible voters were cast and counted, nor in an amount equal to or greater than 33,596, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election.

152. Contestants did not prove under any standard of proof that illegal votes were cast and counted wherein the ballots had problems or irregularities, nor in an amount equal to or greater than 33,596, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election.

153. Contestants did not prove under any standard of proof that illegal votes by deceased voters were cast and counted, nor in an amount equal to or greater than 33,596, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election.

///

30

154. Contestants did not prove under any standard of proof that illegal votes were cast by individuals other than the intended voters and counted, nor in an amount equal to or greater than 33,596, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election.

155. Contestants did not prove under any standard of proof that illegal votes submitted after deadlines were cast and counted, nor in an amount equal to or greater than 33,596, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election.

156. Contestants did not prove under any standard of proof that any illegal votes were cast and counted, or legal votes were not counted at all, for any other improper or illegal reason, nor in an amount equal to or greater than 33,596, or otherwise in an amount sufficient to raise reasonable doubt as to the outcome of the election. Reasonable doubt is one based on reason, not mere possibility.

**C. Contestants did not prove that that "the election board or any member thereof was guilty of malfeasance."**

157. Contestants evidence does not establish by clear and convincing proof, or under any standard of evidence, that "the election board or any member thereof was guilty of malfeasance." NRS 293.410(2)(a).

158. Under Nevada law, "malfeasance . . . constitute[s] an act of commission as distinguished from an act of omission." *Jones v. Eighth Jud. Dist. Ct.*, 67 Nev. 404, 408, 219 P.2d 1055, 1057 (1950).

159. "Omissions to act are not acts of malfeasance in office, but constitute nonfeasance. A distinct difference is recognized between the two. Conduct invoking one charge will not be sufficient to justify the other." *Buckingham v. Fifth Jud. Dist. Ct.*, 60 Nev. 129, 136, 102 P.2d 632, 635 (1940).

160. Malfeasance requires, at the very least, an allegation of knowledge that the act was wrongful, if not a greater level of nefarious intent. *See Jones*, 67 Nev. at 415–18, 219 P.2d at 1060–62 (finding that complaint sufficiently alleged malfeasance by alleging knowledge and agreeing

31

that officer "must have done [the illegal act] knowing that he was doing wrong or at least under such circumstances that any reasonable person who had done the same thing would have known that he was doing something wrong" (quoting *Atwood v. Cox*, 55 P.2d 377, 393 (Utah 1936))).

161. Contestants did not prove under any standard of proof that any of Nevada's election officials committed malfeasance.

162. Contestants did not prove under any standard of proof that Clark County or any other county or state election officials violated any right to observation provided for in Nevada Law. *Cf. Kraus*, slip op. at 11 (concluding that "[p]etitioners [] failed to prove Registrar Gloria has interfered with any right they or anyone else has as an observer" and that Registrar "Gloria has not failed to meet his statutory duties ... to allow members of the general public to observe the counting of ballots").

163. Contestants did not prove under any standard of proof that Clark County election officials or any other election officials acted with knowledge or intent that they were violating the law as it relates to public observation of ballot processing or counting.

164. Contestants did not prove under any standard of proof that Clark County's use of the Agilis machines constitutes malfeasance.

165. Clark County's use of the Agilis machines was lawful under Nevada law. *See* NRS 293.8871(2)(a) (permitting processing and counting of mail ballots "by electronic means").

166. Clark County did not violate the Equal Protection Clauses of the Nevada or U.S. Constitutions by using the Agilis machine, let alone intentionally so, because county by county differences in the way votes are processed does not violate equal protection unless it impedes or obstructs the ability of individual citizens to cast their votes or have those votes counted. *See Kraus*, slip op. at 12–13 (concluding that Clark County's use of Agilis machine is permitted under Nevada's election law and Equal Protection Clause).

167. Contestants did not prove under any standard of proof that Clark County election officials had knowledge that their use of the Agilis, including the settings it was used with and its

use to verify certain ballots without additional human review violated any law, nor that election officials acted with nefarious intent.

168. Contestants did not prove under any standard of proof that any state or county election officials misused electronic voting machines or other voting equipment.

169. Contestants did not prove under any standard of proof that any election officials knowingly committed any misconduct relating to the operation of electronic voting machines, nor that election officials acted with nefarious intent in doing so.

**D. Contestants did not prove that "the defendant or any person acting, either directly or indirectly, on behalf of the defendant has given, or offered to give, to any person anything of value for the purpose of manipulating or altering the outcome of the election."**

170. Contestants evidence does not establish by clear and convincing proof, or under any standard of evidence, that "the defendant or any person acting, either directly or indirectly, on behalf of the defendant has given, or offered to give, to any person anything of value for the purpose of manipulating or altering the outcome of the election." NRS 293.410(2)(e).

171. By its plain terms, this ground requires intentional wrongdoing by a person who (1) has an agency relationship with the candidate—"the defendant or any person acting, either directly or indirectly, on behalf of the defendant"—and (2) offers a thing of value "for the purpose of manipulating or altering the outcome of the election." NRS 293.410(2)(e).

172. Contestants did not prove under any standard of proof that Defendants, the Biden-Harris Campaign, or anyone acting on their behalf gave or offered to give to any person anything of value for the purpose of manipulating or altering the outcome of the election.

173. Contestants did not prove under any standard of proof that NNVP had an agency relationship with Defendants or the Biden-Harris Campaign, or otherwise acted on the behalf of, either directly or indirectly, Defendants or the Biden-Harris campaign.

174. Contestants did not prove under any standard of proof that NNVP gave or offered to give to any person anything of value for the purpose of manipulating or altering the outcome of the election.

175. Contestants did not prove under any standard of proof that the persons witnessed by Doe 3 had an agency relationship with Defendants or the Biden-Harris Campaign, or otherwise acted on the behalf of, either directly or indirectly, Defendants or the Biden-Harris campaign.

176. Contestants did not prove under any standard of proof that the persons witnessed by Doe 3 gave or offered to give to any person anything of value for the purpose of manipulating or altering the outcome of the election.

## CONCLUSION

177. The Contestants failed to meet their burden to provide credible and relevant evidence to substantiate any of the grounds set forth in NRS 293.410 to contest the November 3, 2020 General Election.

## JUDGMENT

Therefore, based upon the above Findings of Fact and Conclusions of Law made by this Court, after trial, and good cause appearing, the following Judgment is entered by the Court:

**IT IS HEREBY ORDERED** that Contestants' contest is **DENIED** and this case is **DISMISSED** with prejudice.

**IT IS HEREBY FURTHER ORDERED** that Contestants are shall pay Defendants' costs pursuant to NRS 293.420.

DATED this _4_ th day of December, 2020.

JAMES T. RUSSELL
DISTRICT JUDGE

34

## CERTIFICATE OF MAILING

Pursuant to NRCP 5(b), I certify that I am an employee of the First Judicial District Court, and that on this 4th day of December, 2020, I caused to be transmitted via email, a true and correct copy of the foregoing Order addressed as follows:

Shana D. Weir, Esq.
6220 Stevenson Way
Las Vegas, NV 89120
sweir@weirlawgroup.com

Jesse R. Binnall, Esq.
717 King Street, Suite 200
Alexandria, VA 22314
jbinnall@harveybinnall.com

Marc E. Elias, Esq.
John M. Devaney, Esq.
Henry J. Brewster, Esq.
Courtney A. Elgart, Esq.
Jyoti Jasrasaria, Esq.
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005-3960
melias@perkinscoie.com
jdevaney@perkinscoie.com
hbrewster@perkinscoie.com
celgart@perkinscoie.com
jjasrasaria@perkinscoie.com

Kevin J. Hamilton, Esq.
Abha Khanna, Esq.
Jonathan P. Hawley, Esq.
Reina A. Almon-Griffin, Esq.
Nitika Arora, Esq.
1201 Third Avenue, Suite 4900
Seattle, WA 98101
khamilton@perkinscoie.com
akhanna@perkinscoie.com
jhawley@perkinscoie.com
ralmon-griffin@perkinscoie.com
narora@perkinscoie.com

Bradley Schrager, Esq.
Daniel Bravo, Esq.
3556 E. Russell Rd.
Las Vegas, NV 89120
bschrager@wrslawyers.com
dbravo@wrslawyers.com

Kimberly M. Carrubba, Esq.
Law Clerk, Dept. 1

35